The **COLLEGE LIFE INSURANCE COMPANY OF AMERICA,** Plaintiff-Appellant,

v.

**Jack V. AUSTIN, Defendant-Appellee.**

**No. 1–284A56.**

Court of Appeals of Indiana, First District.

July 30, 1984.

---

James H. Ham, III, Paula F. Cardoza, Baker & Daniels, Indianapolis, for plaintiff-appellant.

David T. Kasper, Locke Reynolds Boyd & Weisell, Indianapolis, Ronald R. Pritzke, Lineback & Lewis, Greenfield, for defendant-appellee.

ROBERTSON, Judge.

College Life Insurance Company (College Life) appeals an order from the Hancock Circuit Court denying a preliminary injunction against one of its former employees, Jack V. Austin (Austin). College Life sought to enjoin Austin from inducing College Life policyholders from replacing their policies with those issued by another company.

We affirm.

College Life is in the business of issuing life insurance policies and annuities. Austin was an agent for College Life for over twenty years beginning in February, 1961. During his years with College Life, Austin developed a substantial insurance clientele.

On September 9, 1983, College Life terminated Austin's employment for cause pursuant to his employment contract. The contract in effect at that time was executed on January 20, 1983. This new contract did not prevent Austin from representing other insurance companies. Both the 1961 and 1983 contract provided that Austin was an independent contractor.

In September, 1982, knowing that his employment contract with College Life was going to be changed, Austin signed an agency agreement with Banker's Life of Des Moines, Iowa. Austin continued to review the insurance policies of his College Life clientele. In doing so, he usually determined that it was in the individual's best interest to replace their College Life policies with Banker's Life policies.

College Life was aware of Austin's replacement activities from October, 1982 through 1983. In fact, Wayne Griffith, president of College Life, called a meeting to discuss Austin's replacement activities. The testimony concerning what occurred at that meeting is in dispute, however, Austin consistently takes the position that he was only doing what was in the policy-owner's best interest.

Austin continued his replacement activities through 1983. It is alleged that by the time this action was filed, Austin had replaced at least 180 College Life policies. At the time of his dismissal, College Life requested Austin to return all confidential information gained during his employment. Austin returned one of three sets of policyowner cards he had in his possession. Austin told College Life that he had made notes on the cards he retained and that there was nothing on these cards that was not on the insurance policies themselves.

College Life maintains that they have sustained significant losses largely due to Austin's actions. Austin admits that he will continue his replacement activities unless enjoined from doing so, whenever he determines that it is in the best interest of his client. On November 23, 1983, College Life filed a motion for preliminary injunction against Austin. The trial court held an evidentiary hearing and on January 26, 1984, entered findings of fact and conclusions of law and an order denying all preliminary relief requested by College Life.

On appeal, College Life contends that the trial court wrongly denied its request for a preliminary injunction because the decision was based on inadequate findings of fact and erroneous conclusions of law. The scope of our review of a preliminary injunction, the granting or denial of which rests in the sound discretion of the trial court, is limited to the determination of whether the trial court's action constituted a clear abuse of discretion. *Unishops, Inc. v. May's Family Centers, Inc.*, (1980) Ind.App., 399 N.E.2d 760. Discretion to grant or deny a preliminary injunction is measured by several factors: (1) whether the plaintiff's remedies at law are inadequate thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue; (2) whether the plaintiff has demonstrated at least a

reasonable likelihood of success at trial by establishing a prima facie case; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; (4) whether, by the granting of the preliminary injunction, the public interest would be disserved. *Rees v. Panhandle Eastern Pipe Line Co.*, (1978) 176 Ind.App., 597, 377 N.E.2d 640.

In determining whether an abuse of discretion exists in the grant or denial of a preliminary injunction we are involved with a review of the trial court's findings of fact. Whether such findings of fact are adequate depends upon whether they are sufficient to disclose a valid basis under the issues for the legal result reached in the judgment and whether they are supported by evidence of probative value. Such findings may not be set aside unless they are clearly erroneous. *Negley v. Lebanon Community School Corp.*, (1977) 173 Ind. App. 17, 362 N.E.2d 178, *trans. denied*. If the findings are clearly erroneous, we must conclude that the lower court abused its discretion in denying the preliminary injunction.

The trial court found that Austin's contract did not prohibit him from using information he acquired during his employment with College Life. College Life maintains that this is a direct violation of section 4(f) of Austin's employment contract which reads as follows:

. . . .

(f) hold all policyowner lists, rate books, rate cards, materials, forms, supplies and advertising furnished by Company as confidential information and the exclusive property of Company and immediately return the same to Company upon termination of this Contract or upon Company's request.

This court has recently considered another case involving a former College Life agent and a similar provision requiring the agent to return materials to College Life upon termination. In *Steenhoven v. College Life Insurance Company*, (1984) Ind. App., 458 N.E.2d 661, (*trans. denied*), we

reversed the granting of a preliminary injunction to the extent that it prohibited Steenhoven's use of information he acquired during his employment with College Life. In so holding, we focused on the provision of Steenhoven's contract that addressed the return of the company's property upon the agent's termination.

College Life attempts to distinguish this case on the grounds that the contract provisions in *Steenhoven* are entirely different. There is no dispute that the contract provisions are, in fact, different. Section 4(f) specifically sets forth policyowner lists, rate books, rate cards, forms, supplies and advertising as material that is confidential and the exclusive property of the company. The contract provision in *Steenhoven* spoke only to 'books, manuals, records, supplies, and miscellaneous materials furnished agent by company . . . .' However, both contracts are the same in that the pertinent language in each case is "furnished by company". Both require the return of only those records furnished by the company and not those which the agent had developed himself during his employment.

Here, the information on the service cards was lifted from the application which Austin submitted to the company. Austin often placed additional information on the cards by handwritten notes, however, there is nothing on the printed part of the card that is not in the policy itself. Because this information was readily available from the policyholder, we uphold the trial court's finding of no prohibition on the use of information that Austin acquired during the course of his employment.

Such a determination also precludes College Life's argument about "trade secrets". The Uniform Trade Secrets Act, IND.CODE 24–2–3–2, as added by Acts 1982, Pub.L. 148 § 1, states:

"Trade secret" means information including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) drives independent economic value, actual or potential, from not being gener-

ally known to *and not being readily ascertainable by proper means by,* other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. (emphasis added).

The emphasized language is dispositive of the issue. There is evidence showing that the information on the service cards held by Austin, except his handwritten notes, is nothing that an agent from another company could not obtain from the policyholder's file. Because the information was also available from the policyholder himself, from the actual policy, and information given the policyholder from the Company, the Uniform Trade Secret's Act is inapplicable. Consequently, neither the employment contract nor the Uniform Trade Secrets Act precludes Austin's use of information gained during his employment with College Life.

█ College Life next contends that Austin breached section six of his new employment contract signed on January 20, 1983. Section six provides:

*Ownership of Policies:* Second party [Austin] hereby acknowledges and agrees that second party shall not at anytime while this contract is in full force and effect or subsequent to the termination thereof, induce or endeavor to induce any policyowner of Company to discontinue the payment of premiums or to relinquish any policy.

College Life maintains that Austin is responsible for the termination of over two hundred (200) College Life policies and the substitution thereof with policies issued by Banker's Life. The court below again relied on *Steenhoven, supra* to hold that "Austin was neither contractually nor statutorily bound to refrain from his replacement activities". In *Steenhoven,* we found that the provision in the old contract regarding replacement did not contain an express prohibition against replacement. Rather, we noted, "This paragraph [Section 22 of the old Agent's Contract] merely states the company's remedy if the agent

induces policy termination. It does not forbid such action."

In order to avoid the same decision as in *Steenhoven,* College Life asserts that the January 20, 1983, contract was different in form and, therefore, *Steenhoven* is not dispositive. It is true that the new contract specifically forbids such activity anytime while the new contract is "in full force and effect or subsequent to the termination thereof". However, it is the addendum to the new contract that specifically governs activity relating to policies written while the old contract was in effect. It provides:

*First-Year/Renewal Commissions/Career Bonus Payments and Vesting:*

2) Prior to the effective date of termination of the Contract, sums payable under the Prior Contracts as first-year and renewal commissions shall be payable in accordance with the terms and conditions of such Prior Contracts, the Prior Rules and Regulations and in accordance with the terms and conditions of such Prior Contracts, the Prior Rules and Regulations and in the amounts set forth in the Schedule of Commissions to such Prior Contracts as though the same were in full force and effect.

d) Anything to the contrary notwithstanding, in the event Second Party shall:

(i) induce or endeavor to induce any policyholder of Company to discontinue the payment of premiums or relinquish any policy written under the Prior Contract or any other previous contract; or

(ii) induce or endeavor to induce any agent or representative of Company to leave its service;

then and in any and every such event, any and all sums payable under the Contract or the Prior Contracts or otherwise (whether vested or non-vested) that Second Party might be or become entitled to and all rights and interests of Second Party under the Contract, this Addendum or otherwise, shall cease and terminate and Company shall be released and relieved of all obligations to Second Party thereunder.

The agreement states that as to insurance policies which were written while Austin's old agreement was in force, "anything to the contrary notwithstanding", inducement of replacement will result in forfeiture of Austin's renewal commissions. Although Austin had signed the new contract, the addendum provides that inducement of replacement will result in forfeiture of Austin's renewal commissions. We agree with the trial court in that a reading of the new contract and addendum does not forbid Austin from effectuating replacements for College Life policies written prior to January 20, 1983.

The trial court also concluded that to the extent that paragraph 6 of the new contract might be construed to be an absolute prohibition against replacement, it is void and unenforceable. College Life argues that its characterization of the "antireplacement" provisions as absolute prohibitions does not render the provisions unenforceable because Austin could contact and sell additional life insurance to College Life policyholders. He simply cannot induce them to terminate their existing College Life policies. However, the dividing line between contracting and selling additional insurance and inducing policyholders to terminate their College Life policies by comparing them to those of competing companies, is very clouded. Also, the fact that Austin may have been able to contact College Life policyholders does not render the provision "reasonable" as a matter of law. Reasonableness is dependent upon a consideration of duration, geographic area, and the interest sought to be protected. *4408 v. Losure*, (1978) 175 Ind.App. 658, 373 N.E.2d 899, 900. The ultimate determination of whether the covenant is reasonable is a question of law for the courts. *Frederick v. Professional Building Maintenance Industries, Inc.*, (1976) 168 Ind. App. 647, 344 N.E.2d 299.

Restrictive covenants in trade are not favored by the law. *Licocci v. Cardinal Associates, Inc.*, (1983) Ind., 445 N.E.2d 556. Consequently, whatever restraint is larger than necessary for the protection of the party, is void, as being injurious to the interests of the party. *Wiley v. Baumgardner*, (1884) 97 Ind. 66. In the case before us, there were no restrictions as to duration or geographic area. A restraint unlimited in any regard, such as this one, is not required in order to protect College Life's legitimate interests. In spite of this, the antireplacement provisions in College Life's new contract are written as if perpetual.

Interestingly enough, in its prayer for relief, College Life requested an injunction to the date of trial, and for a "reasonable" time, not less than one year thereafter. However, the court may not rewrite the contract provisions. If the covenant, as written, is not reasonable, the court may not enforce a reasonable interpretation. *Frederick v. Professional Building Maintenance Industries, Inc., supra.*

College Life cites *Ebbeskotte v. Tyler*, (1957) 127 Ind.App. 433, 142 N.E.2d 905 in support of its claim that provisions which are indefinite as to time are legitimate non-compete provisions. However, that case is different than this one in that although unlimited in time, it was very narrowly limited in geographical area. We agree with the trial court in that this covenant unlimited in any regard is void as against public policy and unreasonable in light of the interests sought to be protected.

Lastly, College Life maintains that it did clearly establish its right to equitable relief. It is undisputed that the grant or denial of a preliminary injunction rests within the discretion of the trial court. *Elder v. City of Jeffersonville*, (1975) 164 Ind.App. 422, 329 N.E.2d 654. In determining whether the trial court abused that discretion, we do not weigh the evidence, but consider only that evidence which supports the trial court's findings, conclusions, and order. *Rees v. Panhandle Pipeline Co., supra.* The trial court's order will not be disturbed unless it is clearly erroneous or is the result of an improvident exercise of judicial discretion. *Wells v. Au-*

*berry,* (1982) Ind.App., 429 N.E.2d 679. The court's power to issue an injunction should be used sparingly and such relief should not be granted except in rare instances in which the law and facts are clearly in the moving parties' favor. *Id.*

The trial court denied College Life's request for injunctive relief finding that they had failed to show irreparable injury. We also find the circumstances of this case to be inconsistent with a claim of irreparable injury. There is evidence indicating that College Life was well aware of Austin's replacement activities in the fall of 1982. Yet, not until September, 1983, did College Life file suit and not until November, 1983, did it request an injunction. In *Shaffer v. Globe Protection, Inc.,* (7th Cir. 1983) 721 F.2d 1121, the 7th Circuit Court of Appeals noted that a delay in requesting equitable relief is inconsistent with a claim of irreparable injury. College Life offered no evidence as a justification for its delay in requesting the injunction.

Its claim of irreparable injury is also inconsistent with its expectation of replacement activity and the institution of steps to respond. The very purpose of College Life's Conservation Department is to contact policyholders when it learns that one of its policies might be replaced.

Besides College Life's inability to show irreparable injury, its argument also fails because a legal remedy for replacement is set forth in the contract addendum. Furthermore, the evidence shows that the loss incurred is essentially financial and mere economic injury is usually insufficient to warrant the granting of equitable relief. *Wells v. Auberry, supra.*

For the reasons stated above, we affirm the trial court's findings of fact and conclusions of law and order denying College Life's request for injunctive relief.

Judgment affirmed.

NEAL, P.J., and RATLIFF, J., concur.