XPERT AUTOMATION SYSTEMS, CORP., Donald R. Gilliatt and Marc S. Gilliatt, Defendants–Appellants,

v.

VIBROMATIC CO., INC., Plaintiff–Appellee.

No. 80A02–9006–CV–345.[1]

Court of Appeals of Indiana, Fifth District.

March 25, 1991.

Jeffrey S. Nickloy, Campbell Kyle Proffitt, Carmel, for defendants-appellants.

SHARPNACK, Judge.

The plaintiff, Vibromatic Co., Inc., initiated this action by filing a verified complaint seeking both preliminary and permanent injunctions as well as damages for unjust enrichment. This complaint named as defendants Xpert Automation Systems Corp., Donald R. Gilliatt, Marc S. Gilliatt, and Donald R. Bragg. After conducting a hearing, the court entered a preliminary injunction which was subsequently amended to prohibit the defendants from: 1) keeping or using copies of a list of clients generated in response to Vibromatic's discovery; 2) contacting, soliciting, or accepting business from any of the companies named on the list; and 3) identifying themselves with Vibromatic in any manner. In addition, the court ordered the defendants to pay Vibromatic 10% of the funds derived from work performed for companies which were named on the disputed list. Xpert and the Gilliatt brothers appealed the court's entry of the preliminary injunction,[2] but Bragg did not choose to participate in

1. This case has been diverted to this office by order of the Chief Judge.

2. This is the second interlocutory appeal filed in this matter. The Fourth District previously reviewed the trial court's denial of Vibromatic's motion for protective order in *Vibromatic Co. v. Expert Automation Systems Corp.* (1989), Ind. App., 540 N.E.2d 659.

the appeal. (Hereinafter the collective term "defendants" shall refer only to the appealing defendants, except where another meaning is required by context).

 Plaintiff failed to file a timely brief or petition for extension of time to file brief, and both his belated motion for extension of time and his petition to reconsider the belated motion were denied. Because the court of appeals need not burden itself with the responsibility of developing arguments for either party when an appellee fails to file a brief, we have the discretion to reverse the lower court if the appellant demonstrates *prima facie* error. *Burroughs v. Burroughs* (1913), 180 Ind. 380, 381, 103 N.E. 1; *Fisher v. Board of School Trustees* (1986), Ind.App., 514 N.E.2d 626, 628. *Prima facie* error is error appearing at first sight, on first appearance, or on the face of the argument. *Johnson County Rural Electric Membership Corp. v. Burnell* (1985), Ind.App., 484 N.E.2d 989, 991. In addition, the appellee may be considered to have confessed error by not filing a brief, and the appellate court may consider the statement of facts contained in appellant's brief both to be true and sufficient for the disposition of the appeal. *Burnell*, 484 N.E.2d at 991.

The defendants ask this court to remand this cause to the trial court with instructions to modify the injunction to allow defendants to use the disputed list and to do business with the companies named on the list. The defendants do not seek modification of the injunction insofar as it prohibits them from suggesting any connection between them and Vibromatic.

### ISSUE

The defendants identify a single issue on appeal, which we restate:

Were the trial court's findings of fact and conclusions of law sufficient to establish that the disputed customer list was a trade secret under our statute?

### FACTS

The trial court made seventy detailed findings of fact in support of its judgment. We summarize the relevant facts as found by the court.

Vibromatic is an Indiana corporation which makes vibrating parts feeding systems. These systems are designed to move parts of various shapes and sizes to different areas of manufacturing plants. Defendants Donald and Marc Gilliatt were employees of Vibromatic. Donald had worked for Vibromatic for twenty-two years, had at one time been one of its owners, and, for some time before he left employment with Vibromatic, had been its plant manager. Marc had worked for Vibromatic for seven years, and, at the time he left Vibromatic, he was head of production control. Because of their positions, both Donald and Marc developed personal relationships with some of Vibromatic's customers and had access to information which Vibromatic attempted to keep secret by a variety of security measures. This confidential information included its customer list, which was kept on a secured computer disk. Of all of Vibromatic's employees, only Donald and Marc knew how to access the customer list from the disk using the database program on Vibromatic's computer.

On March 6, 1987, Donald gave Vibromatic notice that he intended to terminate his employment on April 15. Marc terminated his employment on April 19. The non-appealing individual defendant, Richard O. Bragg, terminated his employment on April 20. Eight days after the last of the individual defendants left Vibromatic, the three incorporated defendant Xpert. The trial court found that the individual defendants intended to form a corporation to compete with Vibromatic long before they quit. The court also found that Donald Gilliatt expressly misrepresented his intention to go into competition with Vibromatic when asked by its directors after he tendered his resignation but before his termination date.

Shortly after the individual defendants formed Xpert, they began to solicit business from companies which included some of Vibromatic's customers. Because all 228 companies named on a document prepared by the defendants entitled "Prospec-

tive Customers" had been customers of Vibromatic, the trial court explicitly found that the defendants built their customer list on Vibromatic's customer list. The court found that it was common industry practice to keep customer lists secret, and that Vibromatic's list had been purged of various types of problem customers.

Defendants' brief sets forth additional facts not specifically addressed by the court's findings and conclusions. Defendants state that the facts show that there are approximately sixty companies competing in the vibratory parts feeding business. Customers seeking vibratory parts feeding systems generally seek competitive bids on jobs, and usually buy systems from more than one system supplier. There are no exclusive vendor—vendee relationships in the vibratory parts feeder system business.

In their capacities as employees of Vibromatic, the individual defendants became acquainted with potential customers and their representatives. After they left Vibromatic, the individual defendants created a list of approximately five hundred potential customers. Many of these potential customers had been customers of Vibromatic in the past. In addition to the knowledge of the market they gained while employed at Vibromatic, the defendants used manufacturer's representatives, cold calls, and customer referrals to develop a customer base.

After Vibromatic filed suit, it served the defendants with interrogatories. One of these interrogatories requested that the defendants name all the customers which they solicited on behalf of Xpert. The defendants declined to submit a list of all potential customers which they had contacted; instead, they submitted a list of two hundred twenty-eight potential customers that had previously been customers of Vibromatic. It was this list that the trial court concluded was Vibromatic's customer list.

Vibromatic is a growing, successful business concern. It has annual sales of almost $6,000,000.00, and it has a sales base sufficient to allow it to turn down jobs which it believes to be only marginally profitable. Vibromatic has been forced to cut its prices in response to competition by the defendants.

In contrast, Xpert is not financially healthy. It has a substantial negative net worth, with debts amounting to nearly twice its assets. Defendants describe its condition as precarious.

## DECISION

██ The decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court, and normally this court may not reverse unless the trial court abused its discretion. *Harvest Insurance Agency v. Inter–Ocean Insurance Co.* (1986), Ind., 492 N.E.2d 686, 688. The trial court commits an abuse of discretion only when it reaches an erroneous conclusion and judgment—that is to say, one which is clearly against the logic and effect of the facts or the reasonable, probable deductions which may be drawn from the facts. *Boles v. Weidner* (1983), Ind., 449 N.E.2d 288, 290.

The court's most important finding, and the finding most fatal to the issuance of the preliminary injunction, is its finding number 17., which reads:

"Cold calling" various industrial concerns listed in the "Thomas Register" *would be less efficient, more time consuming and costly* than using a list of existing customers and customer contacts with whom a good-will relationship was already established and who have bought such products and are known to be creditworthy.

Based on its findings of fact, the trial court made twenty conclusions of law. Three of these conclusions deal with the customer list:

# 2. Vibromatic's customer list together with knowledge of, and a relationship with, the customer contacts such as project engineers or purchasing agent, [sic] and knowledge of customer special requirements, isolates a pre-screened, creditworthy market of customers who are known buyers of parts feeding equipment and as such has "independent eco-

nomic value" to both its creators and to competitors "who can obtain economic value from its disclosure or use". [citations omitted].

# 3. Although some customers, customer contacts and customer requirements may be known by some competitors, the evidence shows such evidence to be fragmentary and scattered, and customer lists contacts are not *"generally* known" to competitors. [citations omitted].

# 6. Vibromatic's customer list, contacts, customer requirements and its solutions developed to its customers' parts feeding problems are "trade secrets" and as such are entitled to judicial protection. [citations omitted].

Defendants argue that the trial court committed reversible error in finding that the list of 228 Vibromatic customers which they produced in response to Vibromatic's interrogatories was a trade secret protectable under the Uniform Trade Secrets Act, IND.CODE § 24–2–3–1 *et seq.* We agree, and consequently reverse the trial court.

Under the terms of the act, a trade secret is defined as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, *and not being readily ascertainable by proper means by,* other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 24–2–3–2 (emphasis added). Defendants argue that Vibromatic did not keep secret the identity of the customers named on the disputed list and that Vibromatic's competitors either knew or could readily discover the identity of the customers named on the list.

■ Our review of the law and the facts of this case leads to the conclusion that the disputed list is not a trade secret as defined by the act. In *Woodward Insurance, Inc. v. White* (1982), Ind., 437 N.E.2d 59, 68, our supreme court held that a policyholder list could not be considered a trade secret where the information on the list was available from other sources. In *College Life Insurance Co. v. Austin* (1984), Ind.App., 466 N.E.2d 738, the first district of this court also considered the question of whether policy lists and other customer information could be considered trade secrets for purposes of the act. The court implicitly accepted the premise that such information could constitute trade secrets under the proper circumstances, but rejected the contention that the information before the court was a trade secret because the evidence showed that the information could be discovered by means other than misappropriation from the original possessor of the information. Judge Robertson, for the court, wrote:

The emphasized language is dispositive of the issue. There is evidence showing that the information on the service cards held by Austin, except his handwritten notes, is nothing that an agent from another company could not obtain from the policyholder's file. Because the information was also available from the policyholder himself, from the actual policy, and information given the policyholder from the Company, the Uniform Trade Secret's [sic] Act is inapplicable. Consequently, neither the employment contract nor the Uniform Trade Secrets Act precludes Austin's use of information gained during his employment with College Life.

*Austin,* 466 N.E.2d at 743. The second district reached a similar conclusion in *Steenhoven v. College Life Insurance Co.* (1984), Ind.App., 460 N.E.2d 973. Judge Ratliff, in the court's opinion denying College Life's petition for rehearing, wrote:

College Life contends that the policyholder list assumes some potential value when viewed together with certain policyholder information. In our prior opinion, we concluded that such policyholder information could not be considered a trade secret pursuant to the act because it was readily ascertainable from the policyholders themselves. We note that College Life had acknowledged such infor-

mation was readily available from other sources. *See Steenhoven v. College Life Insurance Co. of America* (Ind.App. 1984), 458 N.E.2d 661, at 666 n. 14. This is the same information that could be extracted from the policyholder in a blind replacement attempt. Since the blind attempt would result in the same information being compiled as would an approach based upon the customer list—*i.e.* that the policyholder was a College Life policyholder whose policy provided for certain specific coverages at certain prices—we fail to see how a combination of the readily available policyholder information and the policyholder list would be imbued with such independent economic value as to constitute a trade secret under the act.

*Steenhoven II*, 460 N.E.2d at 974–975 n. 6. In the first *Steenhoven* opinion, the court, addressing College Life's trade secrets argument, had written, "Neither the special agent's contract nor the Uniform Trade Secrets Act preclude Steenhoven's use of the disputed information, *especially in light of its ready availability.*" *Steenhoven v. College Life Insurance Co. of America* (1984), Ind.App., 458 N.E.2d 661, 667 (emphasis added).

Thus it is clear that information which is discoverable by reasonable means cannot be a trade secret. Two cases illustrate this point: in one a customer list was held to be a trade secret because the names on the list were not discoverable by any economically reasonable means, but in the other a customer list was held not to be a trade secret because the names on the list were discoverable by economically reasonable means. Because an understanding of the facts of these cases is essential to an understanding of their holdings, we will discuss the cases in some detail.

In the first of the two cases, *Kozuch v. CRA–MAR Video Center* (1985), Ind.App., 478 N.E.2d 110, the plaintiff video rental center rented video cassette movies and sold video cassette recording hardware. It maintained a list of its customers on a computer it purchased from Radio Shack. On one occasion, the CRA–MAR computer malfunctioned, and the plaintiff was unable to access its customer list from the floppy disk upon which it was kept. A Radio Shack service employee volunteered to access the disk on a Radio Shack computer owned by the defendant. The defendant somehow obtained the information on the disk and began to solicit the plaintiff's customers to join its video club. In obtaining the customer list, the defendant was able to isolate a list of those members of the overall community who were potential video customers. Given the fact that every household is a potential video cassette recorder owner, and thus a potential customer, it would not have been feasible economically to isolate and target the video cassette recorder owners listed on CRA–MAR's list in any other manner. The Third District of this court recognized this to be the case, and wrote:

> There was evidence presented at trial that CRA–MAR's customer list included only the names of owners of video hardware purchased at CRA–MAR and those who had purchased memberships in CRA–MAR's video rental club, and were therefore either customers or prospective customers for video movies. There was also evidence that the customer list *could not have been created by any means other than CRA–MAR's business operations.*

*Kozuch,* 478 N.E.2d at 113 (emphasis added). In part because it was not economically possible to reproduce the information on the CRA–MAR list by any other means, the Third District went on to affirm the injunction issued by the trial court.

In the second case, *Fleming Sales Co. v. Bailey* (N.D.Ill.1985), 611 F.Supp. 507, the Federal District Court for the Northern District of Illinois interpreted the Indiana Uniform Trade Secrets Act in a dispute between an Indiana company, Fleming, and its former employee Bailey. Bailey had risen through the management ranks of the company and had eventually been named to the board of directors. Eventually, he became dissatisfied with the company and resigned. Before he left the company, he and another individual formed another company to compete with Fleming, but

the new company did not actually begin business until after Bailey left Fleming. Some time later, Bailey formed a second company to compete with Fleming, and he hired away some of Fleming's employees. Fleming filed suit in federal court alleging that Bailey misappropriated trade secrets, including the identities of customers, when he left employment with Fleming.

The northern district found Fleming's claim to be governed by Indiana law. In finding that Fleming's customer list was not a trade secret under our act, the court wrote:

> But there is more to the story. All the efforts in the world to preserve confidentiality of information will not suffice if the information is not secret in the first place—if it is "readily ascertainable" by other proper means. Defendants point to several pieces of evidence demonstrating the customer list information could be procured by such other means:
>
> 1. Grady stated that as a rule Fleming's principals know "the customers purchasing the products, the amount of product purchased, and the prices paid for those products." [reference omitted].
>
> 2. Many of Fleming's customers are listed in the telephone directory Yellow Pages or in the trade publication RV Business. [reference omitted].
>
> 3. Others in the business testified (a) competing sales companies generally know who each other's customers are [reference omitted] and (b) it is generally easy for a principal's competitor to find out who that principal's customers are. [reference omitted].
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Here it is undisputed that substantial information as to the identity of Fleming's customers is available from other sources.

*Fleming,* 611 F.Supp. at 513. On the basis of the determination that the customer list and other disputed information was available from other sources, the court found that the information was not a trade secret under our act and granted summary judgment for the defendant.

These cases lead to the conclusion that, in order for a customer list to be considered a trade secret, the information contained on the list must not be discoverable by economically reasonable means. Thus, where a seller is operating in a discrete market with readily identifiable customers, it will be relatively difficult to show that a customer list is a trade secret. However, where a seller operates in a large, diffuse market where it is not easy to identify potential customers, it may be substantially easier to prove that a customer list is a trade secret.

Here, the trial court's findings of fact do not support the conclusion that the customer list—to the extent the information at issue can be called a customer list—is a trade secret. The court only found that it would be more difficult and costly for the defendants to identify the customers by other means. It did not find that it was not economically feasible for the defendants to identify Vibromatic's customers by other means. In fact, the trial court found that customers could be, and in fact were, identifiable by means of the "Thomas Register", a trade publication, contacts with customers, and contacts with competing parts feeder manufacturers. On the basis of these findings, the customer list could not be a trade secret, and the trial court should not have enjoined the defendants from doing business with the customers named on the disputed list. We therefore reverse the court's order entering the injunction insofar as it prohibits the defendants from soliciting or accepting business from the companies named on the list, and insofar as it orders the payment of 10% of the defendants' past profits from sales to companies on the disputed list to Vibromatic.[3] We remand to the trial court with instructions to conform the injunction to the views expressed in this opinion.

---

**3.** Our decision is limited by the record before us on the appeal from the preliminary injunction. A different record may be developed at trial concerning the application for a permanent injunction.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH INSTRUCTIONS.

CONOVER and RUCKER, JJ., concur.