**AMOCO PRODUCTION COMPANY,**
Appellee (Plaintiff Below),

v.

**William D. LAIRD, Gary T. Casper, Control Flow, Inc., I.K. Production Company, and Laird Exploration Company,** Appellants (Defendants Below).

No. 25S05–9310–CV–1144.

Supreme Court of Indiana.

Oct. 21, 1993.

G. Morris Hamm, Schindler & Hamm, P.C., Houston, TX, Ted A. Waggoner, Peterson & Waggoner, Rochester, for appellants.

Franklin A. Morse, II, David R. Melton, Paul B. Hunt, Barnes & Thornburg, South Bend, Craig Hall, Amoco Production Co., Houston, TX, for appellees.

Daniel J. Lueders, Steven E. Zlatos, Spiro Bereveskos, Woodard, Emhardt, Naughton, Moriarty & McNett, Indianapolis, for amicus curiae, Indianapolis Bar Ass'n Patent, Trademark, and Copyright Section.

Thomas J. Dodd, Baker & Daniels, South Bend, Steven E. Zlatos, Woodard, Emhardt, Naughton, Moriarty, & McNett, Indianapolis, for amicus curiae Indiana State Bar Ass'n Patent, Trademark, and Copyright Section.

ON PETITION TO TRANSFER

DICKSON, Justice.

Finding that certain information as to the location of potential oil fields is a trade secret pursuant to Indiana statute, the trial court granted a preliminary injunction sought by Plaintiff–Appellee Amoco Production Company ("Amoco") against Defendants–Appellants William D. Laird, Gary T. Casper, Control Flow, Inc., I.K. Production Company, and Laird Exploration Company (collectively, "Laird"). The Court of Appeals reversed. *Laird v. Amoco Prod. Co.* (1992), Ind.App., 604 N.E.2d 1249. We grant transfer in this case of first impression to address the meaning of the phrase "not being readily ascertainable" as used in the Indiana Uniform Trade Secrets Act, Ind.Code § 24–2–3–1, *et seq.*, substantially derived from the Uniform Trade Secrets Act, 14 *Uniform Laws Annotated*, Uniform Trade Secrets With 1985 Amendments (1990) ("UTSA").

In early 1991, Amoco, a corporation engaged in the identification and production of new sources of oil in the continental United States, became interested in a large area of the Northeast Central United States. Amoco was hopeful of locating oil reserves of 50 million barrels in this area where such a significant discovery would be regarded as quite surprising. In April, 1991, Amoco authorized the formation of a team of experts to more specifically determine the oil reserve potential of the project area. The nucleus of this team consisted of a geologist and a geophysicist deployed on a full-time basis under the supervision of Amoco's exploration manager, Christopher Williams. In its quest for oil reserves, the team first reviewed published literature from the United States Geologic Survey and examined substantial territorial documentation kept by Amoco in a confidential library. The team also interviewed Amoco personnel to learn of previous Amo-

co-sponsored experience in the region. Twenty-four possible production locations were identified through this process.

Williams, after further statistical evaluation by the team, narrowed the endeavor to four sites. Based upon additional assessment of geological fault lines and fracture swarms, the team thereafter was authorized to refine its focus on a 13,000–square–mile area in southern Michigan and northern portions of Ohio and Indiana known as the Trenton Black River formation. The team subsequently suggested that microwave radar, a means by which micro-emissions associated with large concentrations of underground hydrocarbons are detected by radar return to an overflying aircraft, be considered in Amoco's intensified assessment of the formation. John Clendenning, an Amoco geologist consulted as an expert in microwave radar, recommended that Amoco contract with Airborne Petroleum, Inc. ("Airborne") to conduct a microwave radar survey of the area. Supplied by Amoco with a navigational grid designed by the team to locate trending geological fault patterns, Airborne conducted the microwave radar study at a cost to Amoco of $150,000.00. Data retrieved by Airborne was then forwarded by Amoco to QC Data, Inc. ("QC"), which digitized the information and incorporated it into corresponding maps. In addition to its own internal security measures, Amoco took steps to preserve the confidentiality of the survey results through contractual agreements with Airborne and QC.

After its evaluation of the digitized maps, Amoco authorized further microwave radar study in the Indiana counties of Fulton, Marshall, and Kosciusko. Subsequent analysis directed Amoco's interest to two sites lying primarily in Fulton and Marshall Counties with an estimated yield of 22 to 23 million barrels of oil. Amoco sent a senior land negotiator to Fulton County to view the area and gather information relevant to the obtaining of oil and gas leases in the vicinity. On October 29, 1991, Williams met with the team to further assess the two suspected oil fields.

Because estimated production potential fell below the original 50–million–barrel objective, the group recommended deferral of site development pending future study of the reserve locations.

Clendenning, long disappointed by his perception of Amoco's reluctance to rely upon microwave radar findings in favor of more conventional, established technologies, was convinced that Amoco once again would disregard the promise of microwave radar. On November 9, 1991, he sent to Texan William Laird, a former neighbor, oil wildcatter, and oil exploration financier, a facsimile transmission of a page from a road atlas upon which he had drawn circles accurately defining the location of the potential reserve sites. Within nine days, Laird travelled to Fulton County where he employed a douser to more definitively establish the contours of the prospective fields and eventually obtained oil and gas exploration leases for a significant portion of the reserve locations.

In November of 1991, an Amoco vice-president in charge of North American exploration overruled the team's recommended postponement of site development and directed that development should proceed. Surprised at this unexpected turn of events, Clendenning contacted Laird but failed in his attempt to terminate Laird's leasing efforts. Amoco again sent its land negotiator to Indiana whereupon he discovered the extensive lease purchases within the charted reserve areas. This information was reported to Amoco security which later determined that Clendenning was the source of the information provided to Laird.

On January 24, 1991, Amoco brought an action against Laird for a temporary restraining order, a preliminary injunction, damages, and attorney's fees. The trial court granted Amoco's request for a preliminary injunction which prohibited Laird from pursuing or developing oil and gas leases in areas identified by the map and from using or disclosing any other information gained in the discovery or litigation of this case. From the issuance of the prelim-

inary injunction Laird brought the present interlocutory appeal.

Laird contends that Amoco failed to show that (1) it was not economically feasible for Laird to identify the location of the oil fields other than by Clendenning's map or (2) the oil reserves information could not have been created by means other than Amoco's business operations. Thus, Laird reasons, Amoco failed to establish that the information was not "readily ascertainable by other proper means," a requisite statutory element for trade secret protection.

Amoco urges that the oil reserve information highlighted on Clendenning's map is a trade secret. Amoco argues that Ind. Code § 24–2–3–2, the definitional component of the Indiana Uniform Trade Secrets Act,[1] unambiguously sets forth in part that a trade secret refers to information not known to and "not being readily ascertainable" through proper means by others who can obtain economic value from its disclosure or use. Thus, Amoco asserts, because Laird could have duplicated the reserve site information only by considerable expenditure of time, effort, and expense, the information contained on the map was not readily ascertainable and therefore qualifies as a trade secret.

█ It is within the sound discretion of the trial court to grant or deny a preliminary injunction, and the scope of appellate review thereof is limited to whether there has been a clear abuse of that discretion. *Harvest Ins. Agency v. Inter–Ocean Ins. Co.* (1986), Ind., 492 N.E.2d 686, 688. Our review in this case focuses upon the trial court's finding that there was sufficient evidence to support the conclusion that information on the Clendenning map is protectable as a "trade secret," defined in relevant part by Ind.Code § 24–2–3–2 as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and *not being readily ascertainable by proper means* by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind.Code § 24–2–3–2 (emphasis added).

█ Judicial construction of a statute is inappropriate where a statute is clear and unambiguous. *Superior Constr. Co. v. Carr* (1990), Ind., 564 N.E.2d 281, 284; *Community Hosp. of Anderson and Madison County v. McKnight* (1986), Ind., 493 N.E.2d 775, 777. Where a statute is susceptible to more than one interpretation, however, it is ambiguous and open to construction to effect the intent of the legislature. *Hinshaw v. Board of Comm'rs of Jay County* (1993), Ind., 611 N.E.2d 637, 638; *P.B. v. T.D.* (1990), Ind., 561 N.E.2d 749, 750.

Amoco contends that the information appearing on Clendenning's map, the product of an extended and costly exploration effort, is not readily ascertainable and thus constitutes a trade secret under Ind.Code § 24–2–3–2. Conversely, Laird argues that because the information provided by the map could have been duplicated by other economically feasible means, it is readily ascertainable and therefore not a trade secret. We thus recognize the essence of the parties' dispute to be the construction of "not being readily ascertainable," a phrase which, due to its apparent susceptibility to more than one interpretation, is ambiguous.[2]

---

**1.** In L. Samuels and B. Johnson, *The Uniform Trade Secrets Act: The States' Response*, 24 Creighton L.Rev. 49, 54 (1990), the authors observe:

> The definitional section of the UTSA does a great deal more than provide definitions. It is substantive in nature and actually sets forth the elements of what constitutes a violation of the statute through its definitions of improper

means, misappropriation, person, and trade secret.

**2.** We note that other definitional elements of "trade secret" under Ind.Code § 24–2–3–2, such as the existence of the independent economic value of alleged trade secret information, its misappropriation, or efforts reasonable under the circumstances to maintain its secrecy, are not before us as issues raised on appeal.

In finding the "not being readily ascertainable" component of Indiana's statutory definition of "trade secret" to be ambiguous, we note that "trade secret" is "one of the most elusive and difficult concepts in law to define." 1 Melvin F. Jager, *Trade Secrets Law*, § 5.01 (1992 Revision), *quoting Lear Siegler, Inc. v. Ark–Ell Springs, Inc.* (5th Cir.1978), 569 F.2d 286, 288. Moreover,

> [a]lmost any subject matter may be claimed to be a trade secret. But what will be protected as such, and when and against whom such protection will be granted, are questions that cannot be answered with such certainty.

2 Rudolph Callman, *The Law of Unfair Competition, Trademarks, and Monopolies*, § 14.06, 14–35 (4th ed. 1992). Not only have trade secrets been recognized as "extraordinarily difficult to define," James Chapman, *California Uniform Trade Secrets Act: A Comparative Analysis of the Act and the Common Law*, 2 Computer & High–Technology L.J. 389, 392 (1986), but "[a]n exact definition of a trade secret is not possible." *Restatement of Torts*, § 757, Comment b (1939). No general and invariable rule can be laid down to govern the determination of whether a device, process, or other compilation of information should be classified as a trade secret. Alois Valerian Gross, Annotation, *Trade Secrets*, 59 A.L.R.4th 641, § 2[a] (1988). Because a determination of a trade secret is so heavily fact-specific, "the same information that qualifies as a trade secret under one set of facts may not be afforded protection under a different set of facts." J. Henderson, *The Specifically Defined Trade Secret: An Approach to Protection*, 27 Santa Clara L.Rev. 537, 551 (1987).

There are few Indiana cases addressing trade secrets law under Indiana's Uniform Trade Secrets Act. All such cases derive exclusively from our Court of Appeals and, prior to *Laird*, treat trade secrets only in the context of allegedly confidential information embodied in customer lists and related data. *Xpert Automation Sys. Corp. v. Vibromatic Co., Inc.* (1991), Ind.App., 569 N.E.2d 351; *The Prudential Ins. Co. of America v. Baker* (1986), Ind. App., 499 N.E.2d 1152; *Michels v. Dyna–Kote Indus., Inc.* (1986), Ind.App., 497 N.E.2d 586; *Kozuch v. CRA–MAR Video Ctr., Inc.* (1985), Ind.App., 478 N.E.2d 110; *The College Life Ins. Co. of America v. Austin* (1984), Ind.App., 466 N.E.2d 738; *Steenhoven v. College Life Ins. Co. of America* (1984), Ind.App., 458 N.E.2d 661, *reh'g denied* (1984), 460 N.E.2d 973. As such, these decisions are factually divergent from the case before us and offer limited guidance in determining the trade secret status of information under present circumstances.

In this case, the Court of Appeals addressed Ind.Code § 24–2–3–2 as the dispositive statutory provision, noting that a plaintiff's efforts to preserve the confidentiality of information are insufficient "if the information is not secret in the first place—if it is 'readily ascertainable' by other proper means." *Laird*, 604 N.E.2d at 1252, *quoting Fleming Sales Co., Inc. v. Bailey* (N.D.Ill.1985), 611 F.Supp. 507, 513. It then concluded, relying on *Xpert*, 569 N.E.2d 351, that the trial court erred in finding the geographic information to be a trade secret. The Court of Appeals declared that the trial court found only that it would be more difficult and costly for Laird to duplicate the information by its own efforts. The court concluded that because the trial court did not find that it was "economically infeasible" for Laird to identify the location of the oil reserves by proper means other than Clendenning's map, the information was therefore readily ascertainable and thus not a trade secret. *Laird* 604 N.E.2d at 1253. We disagree.

Amoco urges that the Court of Appeals distorted the clear meaning of "not being readily ascertainable" by endorsing a dual standard which requires the plaintiff to show that (1) it would be economically infeasible for the defendants to acquire the same information through other means and (2) there is evidence indicating that the information at issue could not have been created by any means other than plaintiff's business operations.

The economic infeasibility standard is one of recent Indiana judicial creation, first appearing in *Xpert*, where it was asserted that an injunction protecting a customer list as a trade secret was granted in *Kozuch*, "[i]n part because it was not economically possible to reproduce the information ... by any other means." *Xpert*, 569 N.E.2d at 355. Analysis of *Kozuch*, however, reveals no such expression of the economic possibility of information reproduction. *Kozuch*, in this context, recognized only that a customer list "could not have been created by any means other than through [the plaintiff's] business operations." *Kozuch*, 478 N.E.2d at 113. *Kozuch* presents no assessment of the economic feasibility of information acquisition or reproduction.

In *Xpert*, the theory of economic infeasibility was also based upon *Fleming*, 611 F.Supp. 507, a federal case construing Indiana's Uniform Trade Secrets Act. Yet, as in *Kozuch*, *Fleming* found only the ready availability of customer information through other sources without exploring the actual economic feasibility of acquiring or reproducing such information. *Fleming*, 611 F.Supp. at 513. The assertion that *Kozuch* and *Fleming* "lead to the conclusion that, in order for a customer list to be considered a trade secret, the information contained on the list must not be discovered by economically reasonable means," *Xpert*, 569 N.E.2d at 356, distorts the content in both. *Kozuch* and *Fleming* fail to provide a sound precedential basis for an economic infeasibility standard that *Laird*, relying heavily on *Xpert*, would have us acknowledge.

Moreover, the economic infeasibility standard derives no support from the plain language of either the Indiana Uniform Trade Secrets Act or the UTSA. Our examination of these provisions reveals that there exists neither explicit mention nor implication that the economic infeasibility of obtaining information by other proper means is a factor to be considered in determining what information merits trade secret protection. A defendant's economic

capacity to obtain information by other proper means is thus a notion extraneous to either statute. In fact, the Comment to §1, the UTSA's definitional component adopted in its entirety as Ind.Code § 24–2–3–2, states in pertinent part, only that "[i]nformation is readily ascertainable if it is available in trade journals, reference books, or other published materials." Thus, the overlay of an economically infeasible standard upon the UTSA's readily ascertainable standard is clearly inconsistent with the definitional elements of "trade secret" contained in the model statute endorsed *in toto* by our legislature. Economic infeasibility thus would alter Indiana's Uniform Trade Secrets Act by having it mean what it does not say.

Beyond its lack of support in statutory language, the economic infeasibility standard is inconsistent with apparent legislative intent. We note that our General Assembly has declared within the Indiana Trade Secrets Act that

> [t]his chapter shall be applied and construed to effectuate its general purpose to make uniform law with respect to the subject matter of this chapter among states enacting the provisions of this chapter.

Ind.Code § 24–2–3–1(b).

We also observe that in 1982, Indiana adopted the UTSA substantially as promulgated by the National Conference of Commissioners on Uniform State Laws. The Prefatory Note to the UTSA declares not only that the Act is a substitution of unitary definitions of trade secret, but that it "also codifies the results of the better reasoned cases concerning the remedies for trade secret misappropriation." 14 *Uniform Laws Annotated*, Uniform Trade Secrets Act With 1985 Amendments, Prefatory Note, 435 (1990); *see also* Jager, *supra*, § 3.04. It is thus apparent that Indiana legislators, adopting the UTSA, sought the uniform application of UTSA definitions of trade secret consistent with the application of the act in other adopting jurisdictions.[3]

---

**3.** With varying modifications, the UTSA has be-   come law in 39 jurisdictions. Jager, *supra* page

Therefore, case law from other UTSA jurisdictions becomes relevant authority for construction of trade secret law in Indiana.

Other jurisdictions express the notion that due to the embodiment of a wide spectrum of commercial and technical information, the term 'trade secrets' "is susceptible to no precise definition." *Kubik, Inc. v. Hull* (1974), 56 Mich.App. 335, 345, 224 N.W.2d 80, 86; *see also Colorado Supply Co., Inc. v. Stewart* (1990), Col.Ct.App., 797 P.2d 1303, 1306. In determining whether information is protectable as a trade secret, "[t]he first and foremost consideration is whether the ... information is readily accessible to a reasonably diligent competitor." *Surgidev Corp. v. Eye Technology, Inc.* (D.Minn.1986), 648 F.Supp. 661, 682. Courts also generally agree that information alleged as a trade secret must not be readily ascertainable from another source. *Boeing Co. v. Sierracin Corp.* (1987), 108 Wash.2d 38, 49–50, 738 P.2d 665, 674; *Machen, Inc. v. Aircraft Design, Inc.* (1992), 65 Wash.App. 319, 326, 828 P.2d 73, 77.

In determining what information is "readily ascertainable," other jurisdictions have frequently looked to the degree of time, effort, and expense required of a defendant to acquire or reproduce the alleged trade secret information by other proper means. Occasionally, courts have invoked the common law predecessor to the UTSA, *The Restatement of Torts*, § 757 (1939), to assist in the definitional task. "Although all of the Restatement's factors no longer are required to find a trade secret, those factors still provide helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of the statute." *Optic Graphics, Inc. v. Agee* (1991), 87 Md.App. 770, 784, 591 A.2d 578, 585; *see also Minuteman, Inc. v. Alexander* (1989), 147 Wis.2d 842, 853, 434 N.W.2d 773, 778; *Nalco Chem. Co. v. Hydro Technologies, Inc.* (7th Cir.1993), 984 F.2d 801, 803–04.

⬛ Of particular relevance to the case before us is the sixth factor enumerated in the Restatement: "the ease or diffi-culty with which the information could be properly acquired or duplicated by others." *Restatement of Torts*, § 757(b) (1939). Variation exists as to how much time, effort, and funding must be provided in duplicating information before such information is eligible for trade secret protection. Illinois, for example, has found that a trade secret may exist where the duplication of effort was time-consuming, *Televation Communication Sys., Inc. v. Saindon* (1988), 169 Ill.App.3d 8, 16, 119 Ill.Dec. 500, 506, 522 N.E.2d 1359, 1365, relatively time-consuming and expensive, *ILG Indus., Inc. v. Scott* (1971), 49 Ill.2d 88, 94, 273 N.E.2d 393, 396, or producible "after significant time, effort, and expense." *Gillis Associated Indus., Inc. v. Cari–All, Inc.* (1990), 206 Ill.App.3d 184, 190, 151 Ill.Dec. 426, 430, 564 N.E.2d 881, 885. Similarly,

> [i]f the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret. Conversely, information which can be duplicated only by an expensive and time-consuming method of reverse engineering, for instance, could be secret, and the ability to duplicate it would not constitute a defense.

*Hamer Holding Group, Inc. v. Elmore* (1990), 202 Ill.App.3d 994, 1011–12, 148 Ill. Dec. 310, 321, 560 N.E.2d 907, 918. When information can be derived from research, "there must be at least a fair degree of inconvenient or difficult research required before trade secret status will be recognized." Thad G. Long, *Alabama Trade Secrets Act*, 18 Cumb.L.Rev. 557, 564 (1987). Even if information potentially could have been duplicated by other proper means, it is "no defense to claim that one's product could have been developed independently of plaintiff's, if in fact it was developed by using plaintiff's proprietary designs." *Televation Communication*, 119 Ill.Dec. at 506, 522 N.E.2d at 1365. That is, the mere availability of other proper means will not excuse a trade secret misappropriation. Jager, *supra*, § 5.04.

⬛ Alabama has held that information may not be protected as a trade secret

where there is not a "substantial research investment" required to obtain such information. *Public Sys., Inc. v. Towry* (1991), Ala., 587 So.2d 969, 972. Similarly, under New York law, it has been recognized that information is a trade secret only when "discoverable with great effort . . . through the expenditure of considerable time and money. . . ." *Webcraft Technologies, Inc. v. McCaw* (S.D.N.Y.1987), 674 F.Supp. 1039, 1045; *see also Leo Silfen v. Cream* (1972), 29 N.Y.2d 387, 328 N.Y.S.2d 423, 429, 278 N.E.2d 636, 640. Thus, "[t]he more difficult, time consuming and costly it would be to develop the information, the less likely it is 'readily' ascertainable." Peter J. Couture, *Independent Derivation and Reverse Engineering*, Trade Secret Protection and Litigation 615, 623 (1992).

■ The requirement that there be some measure of time, effort, and funding expended in the duplication or acquisition of information appears calculated to assure not "that trade secrets be unascertainable at all by proper means, but only that they not be *readily* or *quickly* ascertainable by such means." Gerald B. Buechler, Jr., *Revealing Nebraska's Trade Secrets Act*, 23 Creighton L.Rev. 323, 340 (1990) (emphasis in original); *see also Electro–Craft Corp. v. Controlled Motion, Inc.* (1983), Minn., 332 N.W.2d 890, 899.

■ Although the standard utilized by other jurisdictions to determine "not being readily ascertainable" varies, we find no case holding that "not being readily ascertainable" adheres when measures required to duplicate or acquire information are so prohibitively burdensome as to be "economically infeasible". An economic infeasibility standard in trade secrets law not only would be unique to Indiana but also would be singularly extreme in its demand that the effort required to duplicate or acquire alleged trade secret information be not merely considerable or significant but so burdensome as to be a virtual economic impossibility.

We thus find that, consistent with the interpretation of the UTSA in other jurisdictions, where the duplication or acquisition of alleged trade secret information requires a substantial investment of time, expense, or effort, such information may be found "not being readily ascertainable" so as to qualify for protection under the Indiana Uniform Trade Secrets Act. Therefore, the trial court's finding that methods of acquiring the information pertaining to the location of the Indiana oil reserve sites "were not simple or easy to accomplish, and are expensive to develop," Record at 173L, is sufficient to support its conclusion that such information was not readily ascertainable and thus entitled to trade secret protection.

We also address Laird's assertion that the alleged trade secret information is readily ascertainable because the discovery of the Indiana reserve sites was facilitated by an already-known process rather than by a procedure exclusively developed, owned, or controlled by Amoco. Laird contends that anyone could have contacted Airborne and hired it to perform the microwave radar survey. Laird also asserts that Amoco's claim must fail because Amoco failed to show that any other form of prospecting, such as satellite imaging, could not have generated the same information.

■ Other jurisdictions have held that a trade secret often may include elements which by themselves may be readily ascertainable in the public domain, but when viewed together may still qualify for trade secret protection. *Machen*, 65 Wash.App. at 327, 828 P.2d at 77.

> A trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere. Such a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but taken together qualify as trade secrets.

*Boeing*, 108 Wash.2d at 50, 738 P.2d at 675 (citations omitted).

> [I]t is a well settled principle 'that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a

competitive advantage and is a protectable secret.'

*Trandes Corp. v. Guy F. Atkinson Co.* (D.Md.1992), 798 F.Supp. 284, 288, *quoting Q–Co. Indus., Inc. v. Hoffman* (S.D.N.Y. 1985), 625 F.Supp. 608, 617. Thus, "the effort of compiling useful information is, of itself, entitled to protection even if the information is otherwise generally known." *ISC–Bunker Ramo Corp. v. Altech, Inc.* (N.D.Ill.1990), 765 F.Supp. 1310, 1322.

Applying the foregoing to the facts of the present case, the Record reveals that, in its exploratory quest, Amoco utilized easily accessible information already within the public domain. United States Geologic Survey reports, as well as other data pertaining to geological fault lines and fracture swarms, are examples of information generally known, at least to those interested in the oil production marketplace, and utilized by Amoco in which Amoco cannot claim a proprietary interest. Similarly, Laird correctly asserts that microwave radar detection of potential oil reserve sites is not a technology which Amoco itself developed or to which it could claim ownership or exclusive access.

Notwithstanding Amoco's use of some information and technology residing in the public domain, Amoco's exploratory effort was nevertheless a unique undertaking. Amoco engaged in a considerable outlay of resources of time, effort, and funding preliminary to and culminating in its decision to utilize microwave radar and contact Airborne. Amoco initially conceived of the exploratory project in an area where 50–million–barrel production capacity was considered surprising. Prior to Laird's receipt of the map, Amoco had invested nearly seven months in project development, including the formation and supervision of an exploration team which included the full-time services of two highly trained employees as well as those efforts of other individuals assigned various tasks related to the project.

Amoco utilized its own proprietary, confidentially-stored information. The team consulted with other Amoco personnel who had previous geological experience with the territory under exploratory consideration. The team engaged in repeated statistical assessments of extensive areas, enabling it to narrow its exploratory focus. Only after allocation of considerable resources did Amoco contract with Airborne for $150,000 to conduct microwave radar surveys of the 13,000–square–mile area. Airborne was provided with an Amoco-generated grid pattern to guide Airborne's flyover procedure.

While some tools leading to Amoco's site discoveries were easily accessible within the public domain, such as U.S. Geological Survey data and the existence of microwave radar technology, we find that, taken together, the integration of pertinent site information and resultant projections as to potential oil reserves constitutes a unique compilation of information not previously known in the marketplace. We thus agree with the trial court's conclusion that the information generated by Amoco, later appearing on Clendenning's map, was not readily ascertainable.

■ As to the applicable burden of proof in a trade secrets case, "[t]he burden is on the one asserting the trade secret ... to show that it is included or embodied in the categories [of protectable trade secrets information] listed [in the trade secrets statute]. *Public Systems*, 587 So.2d at 971. Hence, a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing they exist. *See Diodes, Inc. v. Franzen* (1968), 260 Cal.App.2d 244, 67 Cal.Rptr. 19; *Boeing*, 108 Wash.2d at 49, 738 P.2d at 674.

In the present case, Amoco, by providing evidence sufficient to demonstrate that duplication of its trade secret information would require a substantial investment of time, expense, and effort, established that its geographical information was not readily ascertainable. In meeting the "not being readily ascertainable" element of "trade secret," the only definitional component of Indiana's Uniform Trade Secrets Act at issue in this case, Amoco has met its burden of showing that the geographical information displayed on Clendenning's map is entitled to trade secret protection.

Our decision is consistent with the policies underlying trade secret law which have evolved to promote "[t]he maintenance of standards of commercial ethics and the encouragement of invention...." *Kewanee Oil Co. v. Bicron Corp.* (1974), 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315, 325.

It seems only fair that one should be able to keep and enjoy the fruits of his labor. If a businessman has worked hard, has used his imagination, and has taken bold steps to gain an advantage over his competitors, he should be able to profit from his efforts. Because a commercial advantage can vanish once the competition learns of it, the law should protect the businessman's efforts to keep his achievements a secret.

*Metallurgical Indus., Inc. v. Fourtek, Inc.* (5th Cir.1986), 790 F.2d 1195, 1201. In protecting individual property rights in trade secrets, the purpose of trade secrets law also has been recognized as the promotion of the development of new products and technology. *IMED Corp. v. Systems Eng'g. & Assocs. Corp.* (1992), Ala., 602 So.2d 344, 346. Without the availability of such protection, particularly with respect to exploration for subterranean natural resources, "corporations and individual investors would not risk the large sums of money for geophysical exploration, an expensive but only infrequently rewarding venture." 1 Roger Milgrim, *On Trade Secrets*, § 2.09 (1993).

The initial identification of significant oil reserve locations, though not strictly a new invention, product, or technology, represents the unique discovery of previously unknown deposits of a valuable natural resource. As such, we find that protection of such a discovery is consistent with the policies underpinning trade secrets law.

Transfer is granted. The judgment of the trial court is affirmed.

SHEPARD, C.J. and DeBRULER, GIVAN and KRAHULIK, JJ., concur.