John C. ACKERMAN, Appellant–
Defendant,

v.

KIMBALL INTERNATIONAL,
INC., Appellee–Plaintiff.

No. 19A04–9311–CV–416.

Court of Appeals of Indiana,
First District.

May 23, 1994.

Joseph L. Verkamp, Verkamp & McConnell, Jasper, for appellant.

Mark J. Ruehlmann, Taft, Stettinius & Hollister, Cincinnati, William L. Shaneyfelt, Schneider, Lett & Shaneyfelt, Jasper, for appellee.

NAJAM, Judge.

## STATEMENT OF THE CASE

John C. Ackerman brings a mandatory interlocutory appeal pursuant to Appellate Rule 4(B)(3) from the trial court's entry of a preliminary injunction against him and in favor of Ackerman's former employer, Kimball International, Inc. Kimball terminated Ackerman's employment in August of 1993 under a provision in Ackerman's employment agreement reserving that right. After executing a termination agreement which granted him severance pay and other benefits, Ackerman immediately accepted a position with one of Kimball's competitors. Kimball then sought a temporary restraining order and preliminary injunction against Ackerman to enforce a covenant not to compete in Ackerman's employment agreement and to enforce its remedies under both the termination agreement and the Indiana Trade Secrets Act for Ackerman's threatened disclosure or use of Kimball's trade secrets. The trial court held an evidentiary hearing, granted Kimball's request for a preliminary injunction and enjoined Ackerman from accepting employment with a Kimball competitor and from using or disclosing Kimball's trade secrets.

We affirm.

## ISSUES

We restate the issues presented on appeal as follows:

1. Whether the covenant not to compete in Ackerman's employment agreement with Kimball is unenforceable for lack of consider-

ation where under the agreement Kimball reserved the right to terminate Ackerman's employment at will.

2. Whether Kimball's customer lists, supplier list and pricing information constitute trade secrets.

3. Whether Kimball was entitled to a preliminary injunction against Ackerman.

## FACTS

Ackerman commenced employment with a division of Kimball known as Evansville Veneer & Lumber Company in 1963. Evansville Veneer manufactures and sells wood veneer products, specializing in pecan and cherry veneer.[1] Evansville Veneer acquires veneer logs from suppliers in more than ten different states and sells veneer to customers in 28 states, as well as Canada and Europe.

In 1974, after 11 years of employment, Ackerman executed an employment agreement with Kimball. The agreement provided that Kimball agreed to continue Ackerman's employment in exchange for Ackerman's promise not to compete directly or indirectly with Kimball within one year following his termination and his promise to safeguard Kimball's confidential business information. Kimball reserved the right in the agreement to terminate Ackerman's employment "at any time." Record at 46.

By the late 1970's, Ackerman had advanced to the position of Executive Vice President of Kimball's Ply–Products Division. Ackerman was responsible for oversight of four of Kimball's veneer plants, including the Evansville facility. However, in 1992, Kimball demoted Ackerman to General Manager of Evansville Veneer where he was responsible for the day-to-day operation of the plant. In June of 1993, Ackerman responded to a trade journal employment listing placed by Genwove, a competitor of Evansville Veneer and Kimball in the veneer industry. Ackerman declined an offer of employment from Genwove at that time.

Genwove made Ackerman another offer on August 16, 1993, this time for a more lucrative position as Vice President of Genwove's United States operations with a salary ex-

ceeding Ackerman's salary before his demotion. Ackerman's responsibilities in that position were to include oversight of four Genwove divisions, including two in the veneer business. Ackerman neither accepted nor declined Genwove's second offer.

The following morning, August 17, 1993, Ackerman requested and received a comprehensive list of Evansville Veneer's log suppliers. Ackerman also requested and was provided with two lists of Evansville Veneer's customers which were produced from the company's data base. During a meeting the next day, August 18, Kimball's Vice President for Raw Materials Operations, James R. Hampton, informed Ackerman that his employment was terminated.

Hampton then presented Ackerman with an agreement outlining the conditions of his termination. The agreement ("Termination Agreement") offered Ackerman a "transitional salary allowance" of $15,000.00 and outplacement counseling benefits not to exceed $35,000.00. As a condition for receiving those benefits Ackerman agreed not to use Kimball's trade secrets. The Termination Agreement also specifically stated that it did not supersede the terms of Ackerman's 1974 employment agreement, which was attached to it. Ackerman executed the Termination Agreement at the conclusion of the meeting with Hampton and received the $15,000.00 transitional salary allowance sometime thereafter. On August 19, 1993, Ackerman accepted Genwove's outstanding offer of employment. Kimball then filed suit to enjoin Ackerman's employment with Genwove and alleged that in addition to obtaining its customer and supplier lists, Ackerman had divulged Kimball's pricing information to Kimball's competitors. We will state other, relevant facts in our discussion as needed.

## DISCUSSION AND DECISION

### Issue One: Consideration for At–Will Employment Contract

■ We first address Ackerman's claim that the employment agreement he executed in 1974 with Kimball ("Employment Agree-

---

1. "Veneer" is produced from very high grade, high quality logs. Brief of Appellee at 2.

ment"), which contained a covenant not to compete, is unenforceable for lack of consideration. Ackerman had been employed at Kimball as an at-will employee for 11 years when Kimball requested that he sign the Employment Agreement. The Employment Agreement provided in pertinent part:

"1. Employer agrees to employ or continue to employ Employee at the salary or wage as now or from time to time agreed on. Nothing herein contained shall affect the right of either party to terminate Employee's employment with Kimball International, Inc. at any time.

. . . .

3. Employee agrees that he will carefully guard and keep all information, knowledge or data of Employer or of any customer of Employer which Employee may obtain during the course of his employment, and further agrees that he will not disclose at any time any such information, knowledge or data of Employer or any customer of Employer to others, except such information, knowledge or data as may be generally known to the public.

4. Employee agrees that he will not, without prior written consent of Employer, either during the period of his employment or within one year after the termination thereof, become directly or indirectly engaged in inventing, improving, designing, developing or manufacturing, any products directly competitive with the products of Employer."

Record at 13. According to Ackerman, the Employment Agreement, including the covenant not to compete in Paragraph 4, is unenforceable for lack of consideration because Kimball "gave nothing," was not required to

provide any additional benefits to him and reserved the right to terminate his employment at will. See Brief of Appellant at 19.

We agree that the Employment Agreement favors Kimball. Only one provision of the Employment Agreement, Paragraph 1, places an obligation upon Kimball; all others provisions set forth Ackerman's obligations. Paragraph 1, while a promise by Kimball to continue Ackerman's employment, also reserves the right to terminate his employment "at any time." Record at 13.

Nevertheless, we do not inquire into the adequacy of the consideration exchanged in a contract. *Hamlin v. Steward* (1993), Ind. App., 622 N.E.2d 535, 539. Here, in exchange for his promise not to compete with Kimball or divulge Kimball's confidential business information, Ackerman received Kimball's promise to continue his at-will employment. An employer's promise to continue at-will employment is valid consideration for the employee's promise not to compete with the employer after his termination. See *Leatherman v. Management Advisors, Inc.* (1983), Ind., 448 N.E.2d 1048, 1050; *Rollins v. American State Bank* (1986), Ind.App., 487 N.E.2d 842, 843, *trans. denied.* We conclude that Ackerman and Kimball exchanged valid consideration in the Employment Agreement and that the Employment Agreement is not unenforceable for lack of consideration.[2]

### Issue Two: Trade Secrets

In its Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunction, Kimball essentially brought three claims against Ackerman: (1) violation of the covenant not to compete in the Employment Agreement; (2) violation of cove-

2. We also agree with Kimball's contention that when Ackerman executed a second, Termination Agreement following his termination, Ackerman ratified the 1974 Employment Agreement. The Termination Agreement provided that in exchange for receiving a "transitional salary allowance" of $15,000.00 and other benefits, Ackerman agreed to certain terms including the unconditional release of Kimball from all claims "arising out of or in connection with" his termination. Record at 16–17. Paragraph 10 of the Termination Agreement specifically states that it "does *not* supersede the provisions of the Employment Agreement ... dated October 24, 1974." Record at 16 (emphasis in original).

Thus, in 1993 Ackerman knowingly ratified the Employment Agreement, and all of its contents, when he accepted consideration in the form of severance pay and executed the Termination Agreement. See *Lawlis v. Kightlinger & Gray* (1990), Ind.App., 562 N.E.2d 435, 443, *trans. denied* (where party to contract claims contract is unenforceable, having previously acted with full knowledge of such claim in manner which shows intent to confirm contract, party is deemed to have ratified and waived such claim that contract is unenforceable); *W.T. Rawleigh Co. v. Snider* (1935), 207 Ind. 686, 689, 194 N.E. 356, 358 (party executing contract is bound to know its contents and extent of his liability thereunder).

nants contained in both the Employment Agreement and the Termination Agreement prohibiting Ackerman from disclosure of Kimball's trade secrets; and (3) violation of the Indiana Uniform Trade Secrets Act, Indiana Code § 24–2–3–1 *et seq.* Ackerman maintains that because the covenant not to compete is overly broad and, hence, unenforceable and because Kimball has not shown that its customer, supplier and pricing information are trade secrets, Kimball was not entitled to a preliminary injunction.

Generally, since covenants prohibiting an employee from competing with his former employer are in restraint of trade, they are not favored by the law and are narrowly construed against the employer. *Harvest Insurance Agency, Inc. v. Inter–Ocean Insurance Co.* (1986), Ind., 492 N.E.2d 686, 688; *Licocci v. Cardinal Associates, Inc.* (1983), Ind., 445 N.E.2d 556, 561. Covenants not to compete will be enforced only if they are reasonable with respect to the covenantee, the covenantor and the public interest. *Licocci*, 445 N.E.2d at 561. Whether such a covenant is reasonable is determined by the totality of the circumstances, including consideration of the employer's protectable interest, the duration and geographic area of the covenant, and the proscribed activity. *Fumo v. Medical Group of Michigan City* (1992), Ind.App., 590 N.E.2d 1103, 1109, *trans. denied; College Life Insurance Co. v. Austin* (1984), Ind.App., 466 N.E.2d 738, 744. Here, the covenant not to compete states that Ackerman "will not ... become directly or indirectly engaged in inventing, improving, designing, developing or manufacturing, any products directly competitive with the products of Employer." Record at 46. Where, as here, such a covenant extends beyond the geographic area where Ackerman was employed with Kimball, the covenant is normally considered unreasonable and void as against public policy. *See Austin*, 466 N.E.2d at 744.

However, an employee who is entrusted with or obtains possession of trade secrets may make a valid covenant which prohibits him from "the competitive use or disclosure of such trade secrets *to the full extent of the affected area of the business of*

*the employer." Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 403, 127 N.E.2d 235, 237 (emphasis added). In other words, a covenant not to use or divulge trade secrets is not void simply because it restricts the competitive employment of an employee beyond the area of his former employment. *Id.* at 407, 127 N.E.2d at 239. Kimball contends that Ackerman was entrusted with and had knowledge of Kimball's trade secrets, more specifically its customer, supplier and pricing information. Thus, our inquiry in determining the enforceability of Ackerman's covenant not to compete is the same as our inquiry in evaluating Kimball's contractual and statutory trade secrets claims: whether Kimball's customer lists, supplier list and pricing information constitute trade secrets.

### Kimball's Customer and Supplier Lists and Pricing Information

The trial court made the following findings in concluding that the customer, supplier and pricing information constituted trade secrets:

"8. Because, among other things, of the competitive nature of the veneer log business, Evansville Veneer does not disclose or make public certain of its confidential business information. Included in this information is the price that Evansville Veneer pays for its veneer logs, the suppliers from whom Evansville Veneer acquires its veneer logs, and the customers to whom Evansville Veneer sells its end products....

9. The business information discussed above has independent economic value to Evansville, and if such information fell into the hands of a competitor, it would give that competitor a competitive advantage over Evansville Veneer. Ackerman himself acknowledged that competitors of Evansville Veneer would obtain a commercial advantage if they were able to acquire certain pricing, supplier or customer information of Evansville Veneer....

10. Consequently, Evansville Veneer exercises reasonable means to protect the secrecy of such information. Its supplier, customer and employee lists, and its pricing information, are not made readily available to the general public and are not

obtainable by competitors of Evansville Veneer through economically reasonable means. Evansville takes steps to maintain the secrecy of this information by, among other things, generally limiting the employees who have access to the information, instructing employees who do have access to the information not to disclose it, and storing it on a computer, access to which requires a password and use of which displays a notice to the user indicating the proprietary nature of information stored therein."

Record at 154–56. Ackerman challenges these findings, and others, and directs us to evidence which contradicts the findings in asking us to reverse the trial court's imposition of a preliminary injunction.

The Indiana Uniform Trade Secrets Act defines a "trade secret" as:

"information, including a formula, pattern, compilation, program, device method, technique, or process that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain is secrecy."

IND.CODE § 24–2–3–2. Thus, a protectable trade secret has four characteristics: (1) information; (2) which derives independent economic value; (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and (4) the subject of efforts reasonable under the circumstances to maintain its secrecy. *See id.*

There is substantial evidence in the record to establish that Kimball's customer lists, supplier list and pricing data are protectable trade secrets. First, these lists and pricing data are "information." Kimball was not required to show, as Ackerman contends, that the customer and supplier lists and pricing data meet the definition of a "formula, pattern, compilation, program, device, method, technique, or process." *See* IND.CODE

§ 24–2–3–2. Those statutory terms are merely examples, and not an exhaustive list of examples, of information which may be considered a trade secret. *See id.* ("[t]rade secret means information, *including* a formula, pattern ...") (emphasis added). Further, the testimony of both Ackerman and Frederick Gezik, field log manager for Evansville Veneer, demonstrates that the lists and information derive independent economic value, as each acknowledged that competitors of Kimball would gain either "some advantage" or a "competitive edge" from obtaining the information. Record at 238 and 333–34.

The evidence also supports the trial court's finding that Kimball's customer and supplier lists and pricing information are not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use. Ackerman himself agreed it would be difficult for one of Kimball's competitors to compile both a comprehensive list of Kimball's customers and a comprehensive supplier list. Record at 335. In addition, Michael Watjen, raw materials manager at Evansville Veneer, testified that while a competitor of Kimball might be told the price Kimball pays for veneer logs by simply asking a single supplier, the competitor "wouldn't know, by any source" what prices Kimball actually pays. Record at 266–67.

Gezik corroborated Watjen's testimony and admitted that a competitor could ask a Kimball supplier pricing information but explained that he "doubt[ed] very likely if the supplier would give him [the competitor] that information." Record at 238–39. Gezik further explained that even if a supplier told a Kimball competitor where Kimball purchased logs, that supplier would not divulge the price Kimball was paying for the logs. Record at 238–40. Thus, Kimball's customer lists, supplier list and pricing information are not "readily ascertainable" because that information is not generally known or available outside of Kimball and is very difficult to acquire by Kimball's competitors. *See Amoco Production Co. v. Laird* (1993), Ind., 622 N.E.2d 912, 919 (information requiring substantial investment of time, expense or effort to acquire is "not readily ascertainable"

where method of acquiring information is "not simple or easy to accomplish"); *Woodward Insurance Inc. v. White* (1982), Ind., 437 N.E.2d 59, 67–68.[3]

Finally, there is ample evidence to support the trial court's finding that Kimball took efforts reasonable under the circumstances to maintain the secrecy of its customer lists, supplier list and pricing information. Ackerman confirmed that he did not make it his practice to disclose Evansville Veneer's pricing information to competitors. Record at 338. Watjen stated that, in his capacity as raw material manager, he does not make Kimball's pricing information public knowledge, that he instructs log buyers not to divulge that information, and that Kimball does not disclose such information to competitors. Record at 262 and 266. Watjen denied that log pricing information was common knowledge. Record at 269.

Gezik likewise testified that he does not share information concerning Evansville Veneer's log suppliers with other buyers nor does he talk about its suppliers with competitors because it gives competitors a "competitive edge." Record at 238. Stacey Brown, controller and administrative manager for Evansville Veneer, characterized the customer list at issue in this case as a "confidential document" that she would not typically provide to anyone. Record at 212. Brown also declared that such a comprehensive listing of Kimball's customers would not appear in Kimball's trade publication, Sound Board. Record at 213.

In this appeal, Ackerman has skillfully sifted through the record and emphasized evidence which seems to contradict much of the testimony in Kimball's favor. However, Ackerman has merely directed us to conflicts in the evidence. We may not reweigh the evidence nor determine the credibility of witnesses when reviewing special findings. *Indianapolis Convention & Visitors Association, Inc. v. Indianapolis Newspapers, Inc.* (1991), Ind., 577 N.E.2d 208, 211. Reversal

is warranted only where the trial court's special findings are clearly erroneous, that is, where the record is devoid of facts or inferences supporting the trial court's findings. *Williams v. Rogier* (1993), Ind.App., 611 N.E.2d 189, 192–93, *trans. denied.*

As shown above, there is evidence of probative value in the record concerning Kimball's customer and supplier lists and pricing information which established each element of a protectable trade secret. We find no clear error in the trial court's special findings that Kimball's customer lists, supplier lists and pricing information constitute trade secrets. Therefore, we conclude that Kimball can enforce the covenant not to compete in Ackerman's Employment Agreement and that Kimball can maintain an action for both its contractual and statutory trade secrets claims.

**Issue Three: Preliminary Injunction**

We last review the trial court's decision to grant Kimball's request for a preliminary injunction against Ackerman to enjoin his disclosure or misappropriation of Kimball's trade secrets. The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court. *Laird,* 622 N.E.2d at 915. The scope of our review thereof is limited to whether the trial court committed a clear abuse of that discretion. *Id.* The trial court's exercise of discretion in granting or denying a preliminary injunction is measured by several factors: (1) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the action if the injunction is not granted; (2) whether the plaintiff has demonstrated at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) whether the threatened injury to the plaintiff outweighs the harm which the injunction may inflict on the defendant; and (4) whether, by the grant of the preliminary injunction, the public interest would be disserved. *Whiteco Indus-*

---

**3.** Ackerman's reliance upon *Xpert Automation Systems, Corp. v. Vibromatic Co.* (1991), Ind.App., 569 N.E.2d 351, and its holding that information is "not readily ascertainable" only when it is "not discoverable by economically reasonable means," is misplaced. *See id.* at 356. Our supreme court has expressly rejected the more stringent, "economic infeasibility" standard from *Xpert* in favor of merely requiring proof that acquisition of alleged trade secret information "requires a substantial investment of time, expense or effort." *See Laird,* 622 N.E.2d at 919.

*tries, Inc. v. Nickolick* (1990), Ind.App., 549 N.E.2d 396, 397.

Ackerman concedes that the trial court did not abuse its discretion when it found that Kimball's remedies at law were inadequate and found that the public interest would not be disserved by granting the injunction. Brief of Appellant at 26. Considering the two remaining factors, the evidence demonstrated that Kimball's customer and supplier lists and pricing information qualify as trade secrets. *See* Issue Two. Kimball also presented evidence that Ackerman had access to and knowledge of these trade secrets while employed by Kimball, that he requested such lists immediately prior to his termination and that immediately following his termination he accepted employment with a Kimball competitor.

Under the Employment Agreement and Termination Agreement, Ackerman agreed not to compete with Kimball within one year following the termination of his employment and to safeguard Kimball's trade secrets. Pursuant to the Trade Secrets Act, Ackerman was prohibited from "misappropriating" Kimball's trade secrets, which means that he could not disclose or use Kimball's trade secrets without Kimball's express or implied consent *by acquiring those secrets under circumstances giving rise to a duty to maintain its secrecy or limit its use. See* IND. CODE § 24–2–3–2 (emphasis added). Both the Employment Agreement and the Termination Agreement imposed such a duty upon Ackerman. Thus, given this undisputed evidence, there is a reasonable likelihood that Ackerman will violate either his contractual promises not to compete with Kimball or divulge Kimball's trade secrets, or that he will misappropriate Kimball's trade secrets and violate the Trade Secrets Act. We conclude that Kimball has established a prima facie case and a reasonable likelihood of success on both its contractual and statutory claims against Ackerman.

■ Ackerman also disputes the trial court's finding that the threatened injury to Kimball outweighs the threatened harm that granting the injunction will have upon him. The trial court's findings entered in the grant of a preliminary injunction must reflect a consideration and weighing of the potential harm to each party. *See Fumo v. Medical Group of Michigan City* (1992), Ind.App., 590 N.E.2d 1103, 1108, *trans. denied.* Here, the record discloses that the court considered the following circumstances: (1) Paragraph 11 of the Termination Agreement, in which Ackerman agreed that Kimball would be entitled to seek injunctive relief to enforce the agreement; (2) the severity of a one-year injunction against Ackerman; (3) Ackerman's opportunity to seek employment with an employer not in competition with Kimball; and (4) Kimball's lack of a remedy at law to counteract the effects of dissemination and wrongful appropriation of confidential trade secret information, potential loss of its suppliers and customers, and the potential commercial benefit its competitors would obtain. Record at 19–20.

These findings reveal a consideration of the harm which either Ackerman or Kimball would incur if the court granted or denied Kimball's request for a preliminary injunction. Ackerman's challenge to the manner in which the trial court weighed the equities is, once again, a request that we reweigh the evidence. This we will not do. Thus, we will not disturb the trial court's conclusion that the harm to Kimball outweighed the harm to Ackerman.

We find no merit in Ackerman's various other contentions that: (1) the Trade Secrets Act only permits an injunction to enjoin the acquisition, disclosure or use of a trade secret, not the acceptance of employment; (2) because he had a "right to receive" Kimball's confidential information when he requested it, he did not use "improper means" to obtain the information; (3) an injunction was improper because the only evidence was that he may have "intended to breach his duty" to maintain Kimball's secrets, not evidence that he actually breached that duty; and (4) the injunction is overbroad because it is a "worldwide application" of a covenant not to compete. Brief of Appellant at 45, 47 and Reply Brief at 24, 27. First, the express language of the Trade Secrets Act makes it clear that "[a]ctual or threatened misappropriation may be enjoined." IND.CODE § 24–2–3–3(a). Ackerman's possession of

Kimball's trade secrets together with his prompt acceptance of employment with Genwove, a competitor of Kimball, poses a credible threat that Ackerman will misappropriate Kimball's trade secrets and, thus, may be enjoined.

Ackerman also misreads the "improper means" language in the Trade Secrets Act. The fact that, by virtue of his position, Ackerman was entitled to request and obtain Kimball's customer lists, supplier list and pricing information does not insulate him from liability for his future, unauthorized use of that information. "Improper means" is defined, among other ways, as the breach of a duty to maintain secrecy, and both the Employment Agreement and the Termination Agreement imposed such a duty upon Ackerman. Kimball entrusted Ackerman with its trade secrets for a limited purpose, and Kimball is entitled to injunctive relief to prohibit the threat that Ackerman will breach that trust.

Finally, we are unpersuaded by Ackerman's characterization of the preliminary injunction as having "worldwide" and, hence, overbroad application. The trial court's order for injunctive relief does not state that Ackerman may not accept employment anywhere in the world. Rather, the injunction prohibits Ackerman from accepting employment with a competitor of Kimball, relief to which Kimball is entitled because Ackerman was entrusted with trade secrets. *See Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 403, 127 N.E.2d 235, 237.

The trial court's findings show that Kimball met its burden of establishing it was entitled to injunctive relief against Ackerman.[4] Accordingly, we find no abuse of discretion.

4. Ackerman makes the additional argument that the injunction is overbroad because it seeks to enjoin nonparties such as his wife, who was also formerly employed by Kimball, from employment with a Kimball competitor. Ackerman is apparently referring to language in the injunction order stating that the preliminary injunction shall enjoin "any person or entity in active concert or participation with" Ackerman. Record at 20.

## CONCLUSION

We hold that the Employment Agreement between Ackerman and Kimball is based on valid consideration and is enforceable. We also hold that Kimball's customer and supplier lists and pricing information are protectable trade secrets. Thus, despite the absence of a geographic limitation in the Employment Agreement, Ackerman's covenant not to compete with Kimball within one year of his termination is reasonable and enforceable. Finally, we hold that Kimball satisfied its burden of demonstrating that it was entitled to a preliminary injunction against Ackerman to enjoin Ackerman's threatened disclosure, use or misappropriation of Kimball's trade secrets. The trial court did not abuse its discretion in granting Kimball's request for such an injunction.

Affirmed.

ROBERTSON and CHEZEM, JJ., concur.

Ackerman is the only party in this litigation subject to the injunction, and he does not have standing to object to the scope of the injunction where it purports to restrict nonparties. Although others may be enjoined from unauthorized use or disclosure of Kimball's trade secrets, the separate question whether the trial court may enjoin such nonparties from employment is not properly before us.