
FILED

Nov 25 2024, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

MED-1 Solutions, LLC,
Complete Billing Services, LLC,
Rev-1 Solutions LLC,
The WellFund LLC,
Perfiniti Insurance II LLC,
Bacompt, LLC,
ConnectTec LLC,
EPI Finance Group LLC,
PrivacyDataSystems, LLC, and
NHTI Services, LLC d/b/a Intus Technologies,

*Appellants-Plaintiffs*

v.

Jennifer Taylor and
Health Care Claims Management Inc.,

*Appellees-Defendants*

November 25, 2024

Court of Appeals Case No.
24A-PL-450

Appeal from the Marion County Superior Court

The Honorable Heather A. Welch, Judge

Trial Court Cause No.
49D01-2308-PL-30809

---

**Opinion by Judge Vaidik**
Judges Weissmann and Foley concur.

**Vaidik, Judge.**

## Case Summary

[1]     Appellants, whom the parties refer to collectively as the "RevOne Companies," sought to enjoin a former employee, Jennifer Taylor, from working for a competitor based on several non-competition agreements Taylor executed during her employment. Taylor signed one non-competition agreement as a condition of her hiring, and then a few years later, she was told she had to sign a new agreement or she'd be fired. The trial court found that the second agreement was not supported by consideration because Taylor's employment was the consideration for the initial non-competition agreement, so her continued employment could not serve as consideration for the second agreement. Concluding that the RevOne Companies failed to show a reasonable likelihood of success on the merits, the trial court denied their motion for preliminary injunction.

[2] The RevOne Companies now appeal. We hold that, where an at-will employee signs a non-competition agreement as a condition of their hiring and is later told to sign a new non-competition agreement or they will be fired, the employee's continued employment can serve as consideration for the latter agreement. But because the trial court correctly concluded that the RevOne Companies failed to show a reasonable likelihood of success, we affirm.

## Facts and Procedural History

[3] The RevOne Companies are MED-1 Solutions, LLC, Complete Billing Services, LLC, Rev-1 Solutions LLC, The WellFund LLC, Perfiniti Insurance II LLC, Bacompt, LLC, ConnectTec LLC, EPI Finance Group LLC, PrivacyDataSystems, LLC, and NHTI Services, LLC d/b/a Intus Technologies. William Huff owns the RevOne Companies and operates them together as an integrated series of revenue-cycle-management companies. As an individual entity, MED-1 Solutions primarily provides third-party collection services to hospital systems and hospital-owned physician groups.

[4] In October 2010, Taylor received an offer of employment from MED-1 Solutions. The offer letter provided that Taylor's employment was "contingent upon" the execution of a non-competition agreement and would be considered at-will. Ex. 8. Taylor signed both the offer letter and the non-competition agreement ("the 2010 Agreement") and began working for MED-1 Solutions as Marketing Manager. The 2010 Agreement states that for two years after the

termination of Taylor's employment with MED-1 Solutions (referred to in the agreement as "the Company"), Taylor

> shall not own, manage, operate, control, or otherwise be in any manner affiliated or connected with, or engage or participate in the ownership, management, operation or control of (as principal, agent, proprietor, partner, member, shareholder, director, trustee, officer, administrator, employee, consultant, independent contractor, or otherwise) any business or entity that owns or operates any medical fee collection services within 20 miles of any business owned by the Company on the last day of [Taylor's] employment.

*Id.*

In April 2014, Huff presented Taylor and other salaried staff of the RevOne Companies with a new non-competition and confidentiality agreement and told them that if they didn't sign it, they'd be fired. This new agreement ("the 2014 Agreement") provides, in relevant part:

> [I]n consideration of the Recitals, Employee's employment and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

> > 1. Non-Disclosure of Confidential Information: Employee shall at no time hereafter use, misappropriate, divulge, furnish, disclose or otherwise make accessible to any individual . . . or other entity (hereinafter "Person"), any Confidential Information of Company or person or entity controlled by, controlling, or under common control with Company ("Affiliate"). Confidential Information includes, but is not limited to, trade secrets, all forms of manuals,

catalogues, pricing information, client fee arrangements, sales literature, past and present client lists and potential client lists, and customers, financial information, methods, systems, business plans, reports, intellectual property, employee manuals, business know-how, and any and all data records of Company not otherwise available to the general public. . . .

. . .

3. Restrictive Covenant: Employee, for the period Employee is employed by Company or Affiliate and for a period of 12 months after the date of termination of such employment for any reason, shall not, within a 50-mile radius of any client, Company, or person or entity that has been a client of the Company within the 12-month period preceding Employee's termination, or otherwise within a 50-mile radius of any office Company or Affiliate:

> a. Form a business which provides, in whole or in part, receivable management, billing, and collections (hereinafter "Company Services"); or

> b. Directly or indirectly become affiliated with, employed by, acquire an interest in any Person that performs, in whole or in part, Company's Services or any other competitive activity . . . .

. . .

6. Cumulative Remedies, Enforceability, Severability And Attorney's Fees: Employee agrees that:

> . . .

c. Should it be held at any time by a court of competent jurisdiction that any of the covenant or agreements set forth in this Agreement are illegal, invalid or unenforceable, the validity of the remaining parts shall not be affected, and any illegal, invalid or unenforceable part shall be deemed not to be part of this Agreement, and the other portion shall remain in full force and effect. . . .

7. At-Will Employment: Employee agrees that she is employed on an at-will basis, and nothing in this Agreement shall confer upon Employee the right to continue in the employment of Company or to expect employment for any definite duration or affect any right which the Company or the Employee may have to terminate the employment with or without cause and with or without notice at any time.

8. Entire Agreement: This Agreement represents the entire agreement between the parties with respect to the Employee's covenants of non-disclosure, confidentiality and non-competition and supersedes any other agreements, representation or understanding written or oral, between the parties with respect to those matters.

Ex. 9. Where "Company" in the 2010 Agreement refers solely to MED-1 Solutions, the 2014 Agreement defines "the Company" as MED-1 Solutions, Complete Billing Services, Rev-1 Solutions, EPI Finance Group, and The WellFund. Huff signed the 2014 Agreement on behalf of the Company.

Though Taylor was employed and paid by MED-1 Solutions, she performed work for all the RevOne Companies as part of her role. In 2020, Taylor was

promoted to Chief Operating Officer of the RevOne Companies, and Huff requested she sign another non-competition agreement ("the 2020 Agreement"). However, there is no evidence that Taylor executed the 2020 Agreement.

[7] At the end of 2022, Taylor tendered her letter of resignation to Huff, but she continued working for the RevOne Companies for several more months until March 2023. A month later, Taylor began working for Health Care Claims Management Inc. (HCM), which provides revenue-cycle services to healthcare clients. Huff learned of Taylor's employment with HCM in June 2023. In August, the RevOne Companies sued Taylor and HCM, seeking injunctive relief and alleging Taylor breached the 2010, 2014, and 2020 Agreements by working for HCM and using the RevOne Companies' confidential and proprietary information. Several weeks later, the RevOne Companies moved for a preliminary injunction against Taylor and HCM, and the trial court set the motion for hearing.[1]

[8] At the hearing, Dan Gietl, Chief Information Officer for the RevOne Companies, testified about a third-party digital-forensics analysis performed on Taylor's company computer. The forensics report showed the number of locally

---

[1] Before the hearing on their motion for preliminary injunction, the RevOne Companies moved for leave to file an amended complaint. Without ruling, the trial court informed the parties that it wouldn't address anything in that motion during the hearing. Thus, the hearing concerned only the claims in the original complaint. Because this is an appeal from the trial court's denial of the motion for preliminary injunction, and the amended complaint was not at issue in that determination, the contents of the amended complaint have no bearing on our review here.

accessed files and the volume of activity on external storage drives, but it didn't show whether a particular file was uploaded from the RevOne Companies' network to an external drive. Gietl testified that he assumed "accessed means opened, read, copy, moved, potentially deleted," but based on the forensics report, he couldn't determine what action was taken. Tr. Vol. II p. 218. He explained there was a "tremendous amount of cloud activity" on Taylor's company computer, *id.* at 202, including over 3,000 "Activity References" on Google Drive between November 2022 and February 2023, Exs. 50, 51. Gietl opined that there was "a strong correlation between the activity of accessing so many files in such a short time and the high correlation to when the drives were accessed." Tr. Vol. II p. 201. That said, Gietl acknowledged that the only way to determine whether the locally accessed files were moved to an external drive would be to log into the external drive itself. Huff testified that, based on Taylor's responsibilities between her tender of resignation in December 2022 and her departure in March 2023, there was "no reason" for her to be accessing some of the locally accessed files shown in the digital-forensics report. Tr. Vol. III pp. 68-70.

[9] Scott Schoenherr, HCM's Chief Information Officer and Taylor's new coworker, testified that Taylor has never mentioned "methods or approaches or tools that RevOne Companies used to deliver services to their client" or provided "any information or data or documents from her tenure at the RevOne Companies." *Id.* at 95, 96.

Taylor testified that she has a Google Drive account and two Gmail accounts—one personal email and one for work she does at her church. She provided screenshots of the Google Drive connected to her personal email, which don't show any uploads of information or files from the RevOne Companies. Taylor testified that she never deleted any RevOne files from her Google Drive. As to the locally accessed files shown in the digital-forensics report, Taylor explained that she'd accessed those files after tendering her resignation because she was putting together a succession plan and working with other employees to transition her responsibilities to them. And she was still serving some existing clients and actively onboarding two new clients.

The trial court denied the RevOne Companies' motion for preliminary injunction. In its order, the court concluded that based on the "Entire Agreement" provision in the 2014 Agreement, the 2010 Agreement was "superseded" by the 2014 Agreement and thus was no longer in effect. Appellants' App. Vol. II p. 35. Turning to the 2014 Agreement, though, the court determined it was not a valid agreement because it was not supported by sufficient consideration. Specifically, the court found that Taylor's employment was the consideration for the 2010 Agreement and thus her continued employment could not serve as consideration for the 2014 Agreement. Nonetheless, the court addressed the terms of the 2014 Agreement. Because the 2014 Agreement includes a severability clause, the court considered the provisions individually and concluded, in relevant part: (1) the covenant not to compete is not enforceable because it is overbroad; (2) the RevOne Companies

did not establish a prima facie case that Taylor violated the non-disclosure provision; and (3) the inevitable-disclosure doctrine does not apply. Finally, the court found that the RevOne Companies failed to establish that Taylor executed the 2020 Agreement, and thus it did not address the substance or enforceability of that agreement. Concluding that the RevOne Companies failed to show a reasonable likelihood of success on the merits, the court did not consider the remaining preliminary-injunction elements.

[12] The RevOne Companies now bring this interlocutory appeal as a matter of right under Appellate Rule 14(A)(5).

## Discussion and Decision

[13] The RevOne Companies contend the trial court should have granted their motion for preliminary injunction. To obtain a preliminary injunction, the moving party must demonstrate by a preponderance of the evidence the following: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the moving party outweighs the potential harm to the nonmoving party that would result from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. *Leone v. Comm'r, Ind. Bureau of Motor Vehicles*, 933 N.E.2d 1244, 1248 (Ind. 2010).

[14] A judgment entered against the party bearing the burden of proof is a negative judgment. *Smith v. Dermatology Assocs. of Fort Wayne*, 977 N.E.2d 1, 4 (Ind. Ct.

App. 2012). Here, the RevOne Companies are appealing from a negative judgment and therefore must establish that the trial court's judgment is contrary to law. *Pinnacle Healthcare, LLC v. Sheets*, 17 N.E.3d 947, 953 (Ind. Ct. App. 2014). "A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court." *Id.* (quotations omitted).

## I. The trial court erred in concluding that the 2014 Agreement was not supported by sufficient consideration

[15] Before determining whether the RevOne Companies satisfied the requirements for a preliminary injunction, the trial court had to determine which of the non-competition agreements is controlling. The RevOne Companies contend the trial court erred in concluding that the 2014 Agreement is not a valid agreement due to lack of consideration. The elements of a valid contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties. *Bassett v. Scott Pet Prods., Inc.*, 194 N.E.3d 1185, 1192 (Ind. Ct. App. 2022), *trans. denied*. "Consideration consists of a bargained-for exchange." *Id.* To constitute sufficient consideration to create a contract, a benefit must accrue to the promisor or a detriment must accrue to the promisee. *Id.* A benefit is a legal right given to the promisor to which the promisor would not otherwise be entitled, while a detriment is a legal right that the promisee has forborne. *Ind. Dep't of State Revenue v. Belterra Resort Ind., LLC*, 935 N.E.2d 174, 179 (Ind. 2010), *modified on reh'g on other grounds*, 942 N.E.2d 796 (Ind. 2011).

[16]    Relying on *Buschman v. ADS Corp.*, 782 N.E.2d 423 (Ind. Ct. App. 2003), *Hinkel v. Sataria Distribution & Packaging, Inc.*, 920 N.E.2d 766 (Ind. Ct. App. 2010), and *Bassett*, the trial court concluded that Taylor's continued employment was not sufficient consideration to support the 2014 Agreement because her employment was the consideration for the 2010 Agreement. In *Buschman* and *Hinkel*, prospective employees discussed certain severance benefits with employers during hiring negotiations but eventually signed employment agreements that didn't include the benefits. In both cases, after the employees signed the agreements, the employers purportedly made oral promises as to the severance benefits. But when the employees were terminated, they weren't paid severance as promised, so they each sued to enforce the severance promises. On appeal, we found in each case that the written employment agreements represented the parties' final agreements. We then considered whether, to the extent the employers made oral severance promises after the employment agreements were executed, the oral promises constituted modifications of the agreements. We ultimately concluded they did not because the employees hadn't provided additional consideration in exchange for those promises. Both employees contended they had provided consideration by working for their employers, but we rejected those arguments because their work was the consideration for each of their initial employment agreements. *See Buschman*, 782 N.E.2d at 430 ("Buschman's work at ADS was the consideration for ADS's offer embodied in the [employment agreement] and is not new consideration."); *Hinkel*, 920 N.E.2d at 770-71 ("Hinkel had assumed those duties and employment obligations as consideration for the original agreement. . . . Any

subsequent promise by [the employer] respecting severance was not supported by an independent, bargained-for exchange.").

[17] Then, we considered both *Buschman* and *Hinkel* in *Bassett*. There, Bassett was the president of Scott Pet Products, which was acquired by another company. Bassett executed an employment agreement with the new owners in which they agreed he would stay on as president. The employment agreement didn't mention an ownership interest for Bassett. At various points over the next several years, Bassett and the new owners negotiated orally and in writing about him acquiring an ownership interest, but negotiations always died out. As part of a deal to secure a loan, Bassett was purportedly promised a future ownership interest, but he was ultimately terminated and told he had no enforceable interest. Bassett argued that his continued employment provided consideration for the promise of an ownership interest. In light of *Hinkel* and *Buschman*, we concluded that Bassett's continued and future employment was the consideration for the employment agreement, which did not mention an ownership interest, so his continued employment "could not, therefore, supply the necessary consideration to render enforceable any promises" that could have modified the employment agreement. *Bassett*, 194 N.E.3d at 1194.

[18] *Buschman*, *Hinkel*, and *Bassett* are distinguishable from the circumstances before us. Each of those cases involved a written agreement executed by the parties and an additional promise by the employer that wasn't included in the written agreement. While the employees later argued that they continued to work in exchange for the employers' additional promises, they never expressly

conditioned their continuing to work upon those promises. In other words, there was no bargained-for exchange. Here, by contrast, we have two distinct written agreements, each resulting from a separate bargained-for exchange: (1) in exchange for Taylor signing and thereby agreeing to the terms of the 2010 Agreement, MED-1 Solutions promised to commence her employment; and (2) in exchange for Taylor signing and thereby agreeing to the terms of the 2014 Agreement, Huff promised to continue employing her.

[19] We find *Ackerman v. Kimball International, Inc.*, 634 N.E.2d 778 (Ind. Ct. App. 1994), *adopted in relevant part*, 652 N.E.2d 507 (Ind. 1995), to be instructive. There, after Ackerman had been working as an at-will employee for Kimball for eleven years, he signed an employment agreement under which he promised not to compete with Kimball for one year following his termination and not to disclose Kimball's confidential business information. Under the agreement, in exchange for Ackerman's promises, Kimball would continue to employ him, but Kimball reserved the right to terminate Ackerman's employment at any time. When Ackerman was later terminated, he argued that the agreement was unenforceable for lack of consideration because Kimball "gave nothing"—it "was not required to provide any additional benefits to him and reserved the right to terminate his employment at will." *Id.* at 781. On appeal, we found that even though the only obligation the agreement placed upon Kimball was its promise to continue employing Ackerman, while the remainder of the agreement set forth Ackerman's obligations, this still constituted an exchange of valid consideration. *See id.* ("Paragraph 1, while a promise by Kimball to

continue Ackerman's employment, also reserves the right to terminate his employment 'at any time.' Nevertheless, we do not inquire into the adequacy of the consideration exchanged in a contract." (record citation omitted)). We ultimately concluded, "An employer's promise to continue at-will employment is valid consideration for the employee's promise not to compete with the employer after his termination." *Id.*; *see also Rollins v. Am. State Bank*, 487 N.E.2d 842, 843 (Ind. Ct. App. 1986) (finding that continued employment in at-will position constituted consideration for employee signing non-competition agreement six months after employment began), *reh'g denied*, *trans. denied*.

[20] Like in *Ackerman*, in exchange for Taylor's promise not to compete with the RevOne Companies or divulge their confidential business information, Taylor received Huff's promise to continue her at-will employment. Taylor and HCM suggest that the latter promise cannot serve as consideration for the 2014 Agreement because that same promise was the consideration for the 2010 Agreement. *See* Appellees' Br. pp. 45-46. We disagree. While past consideration generally cannot support a new promise, *see Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 858 (Ind. Ct. App. 2007), we find Huff's 2014 promise to be distinct from the consideration for the 2010 Agreement. As noted above, the promise made in exchange for Taylor executing the 2010 Agreement was that Taylor's employment with MED-1 Solutions would commence. In return for the promises Taylor made by signing the 2014 Agreement, Huff agreed to continue employing her. As an at-will employee, Taylor had no legal right to continued employment. Huff's promise to continue employing Taylor was a

benefit to Taylor to which she would not have otherwise been entitled. This is sufficient independent consideration to support the 2014 Agreement.

[21] It is true that, under the 2014 Agreement, Taylor did not receive a right to employment for any particular duration and Huff still could have terminated her at any time, even after she signed the agreement. But "we do not inquire into the adequacy of the consideration exchanged in a contract." *Ackerman*, 634 N.E.2d at 781. Because the parties exchanged valid consideration in the 2014 Agreement, and this consideration is independent of the consideration for the 2010 Agreement, the trial court erred in concluding that the 2014 Agreement is not supported by sufficient consideration. The 2014 Agreement is a valid contract.[2]

[22] The 2014 Agreement's "Entire Agreement" provision states that it "supersedes any other agreement" between the parties "with respect to the Employee's covenants of non-disclosure, confidentiality and non-competition." Accordingly, the 2014 Agreement superseded the 2010 Agreement, and the 2010 Agreement is no longer in effect.

---

[2] We do not give an opinion about a situation where the employer in bad faith has the employee sign a non-competition agreement and shortly afterwards fires the employee. Here, the 2014 Agreement was signed well before Taylor quit her employment with the RevOne Companies.

## II. The trial court did not err in concluding that the RevOne Companies failed to show a reasonable likelihood of success on their claims that Taylor breached the 2014 Agreement

[23] The RevOne Companies maintain that the trial court erred in concluding that they failed to show a reasonable likelihood of success on the merits. As the moving party, the RevOne Companies needed to show by a preponderance of the evidence that they have at least a reasonable likelihood of success at trial by establishing a prima facie case. *Ind. Fam. & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002).

[24] The trial court concluded that the RevOne Companies did not show a reasonable likelihood of success on their claim that Taylor breached the covenant not to compete in the 2014 Agreement because the covenant is overbroad and therefore unenforceable. The court also found that the RevOne Companies hadn't established a prima facie case that Taylor breached the non-disclosure provision of the 2014 Agreement. We will consider each provision in turn.

### A. Covenant Not to Compete

[25] The RevOne Companies argue the trial court erred in concluding that the covenant not to compete in the 2014 Agreement is unenforceable because it is overbroad. Non-competition agreements in employment contracts are in restraint of trade and have long been disfavored by law. *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728-29 (Ind. 2008). We construe these agreements strictly against the employer and will not enforce an unreasonable agreement.

*Id.* at 729. "In arguing the reasonableness of a non-competition agreement, the employer must first show that it has a legitimate interest to be protected by the agreement. The employer also bears the burden of establishing that the agreement is reasonable in scope as to the time, activity, and geographic area restricted." *Id.* (citations omitted). The reasonableness of a non-competition agreement is a question of law, which we review de novo. *Id.*; *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 152 (Ind. 2019).

[26] The RevOne Companies claim they have a legitimate interest in protecting their customer goodwill and confidential information. *See, e.g.*, *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 173 (Ind. Ct. App. 2008) ("In Indiana, the law recognizes a protectible interest in the good will generated between a customer and a business. . . . Good will includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact." (quotation omitted)). Taylor and HCM don't dispute this legitimate interest, but they contend the covenant not to compete is unreasonable because it prohibits Taylor from working for a competitor in any role, "including in a position entirely different than her position at Med-1" or "any other position that does not even conceivably implicate any of the RevOne Companies' protectible business interests." Appellees' Br. pp. 39-40. We agree.

[27] While the covenant not to compete defines "Company Services" as "receivable management, billing, and collections," it doesn't merely prohibit Taylor from performing these particular services for a competitor; rather, the relevant portion of the covenant, paragraph 3(b), bars her from "[d]irectly or indirectly

becom[ing] affiliated with, employed by, [or] acquir[ing] an interest in" any entity that performs these services, in whole or in part.[3] As the trial court highlighted, the plain language of this provision would bar Taylor from becoming employed in any role for a business that performs these services, including, for example, as a security officer or custodian—roles that "do not implicate a protectable interest of the RevOne Companies." Appellants' App. Vol. II p. 43.

[28] We have found covenants not to compete prohibiting an employee from working for a competitor in any capacity or from competing with portions of the business with which the employee was never associated to be unreasonable because they extend beyond the scope of the employer's legitimate interests. *See, e.g.*, *Gleeson*, 883 N.E.2d at 175-77; *MacGill v. Reid*, 850 N.E.2d 926, 931-32 (Ind. Ct. App. 2006); *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 812 (Ind. Ct. App. 2000). The language in paragraph 3(b) is substantially similar to the language of the covenants in those cases. *See Gleeson*, 883 N.E.2d at 175 ("[Employee] shall not: directly or indirectly own, manage, operate, control, invest in, lend to, acquire an interest in, or otherwise engage or participate in . . . any business . . . which directly or indirectly competes with any Business of the Company."); *MacGill*, 850 N.E.2d at 931 ("[Employee] will not own, manage, or materially participate in any business substantially similar

---

[3] The covenant not to compete in the 2014 Agreement applies "for a period of 12 months after the date of termination of [Taylor's] employment." Ex. 9. Taylor's last day at the RevOne Companies was March 3, 2023, more than 20 months ago. Neither party argues that the passage of 12 months affects our review.

to [employer's] business[.]"); *Burk*, 737 N.E.2d at 812 ("Employee will not . . . [o]wn, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated . . . with any . . . other business entity which competes with, or otherwise engages in any business of the Corporation[.]"). We find that the scope of activity restricted by the covenant is unreasonably broad.

[29] Yet, the RevOne Companies argue that we may use the blue-pencil doctrine to render the covenant not to compete enforceable. "If a court deems a noncompetition provision unreasonable, it will apply the 'blue pencil doctrine,' severing unreasonable, divisible portions and then enforcing the reasonable parts that remain." *Heraeus*, 135 N.E.3d at 153. But this doctrine "is really an eraser"—while the court may erase unreasonable, divisible terms from a restrictive covenant until only reasonable portions remain, it cannot rewrite the covenant by adding, changing, or rearranging terms.[4] *Id.* at 151, 153. If the covenant cannot be blue-penciled in a way that would render it reasonable, it is void and unenforceable. *Id.* at 153.

---

[4] The severability clause in the 2014 Agreement also provides:

> [I]f any court shall finally determine that the restraints provided for in any such covenants and agreements are too broad as to the area, activity or time covered, said area, activity or time covered may be reduced to whatever extent the court deems reasonable, and such covenants and agreements shall be enforced as to such reduced area, activity or time covered as the court deems appropriate[.]

Ex. 9. But "courts cannot add terms to an unenforceable restrictive covenant in a noncompetition agreement—even when that agreement contains language purporting to give a court the power to do so." *Heraeus Med.*, 135 N.E.3d at 153. Thus, this portion of the severability clause is inoperative.

[30] Despite urging us to apply the blue-pencil doctrine, the RevOne Companies don't point to specific language we could strike that would render the remainder of the covenant not to compete reasonable. Nor do they specify whether they want us to delete unreasonable portions from paragraph 3(b) or strike paragraph 3(b) from the covenant entirely. But either way, blue-penciling would not improve the RevOne Companies' likelihood of success on the merits. Looking at the text of paragraph 3(b), there is no portion we could strike to render the remainder reasonable; any language that would remain would still bar Taylor from working for a competitor in any capacity or from competing with every practice area of the RevOne Companies, even those with which she was never associated. *Compare Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 784 (Ind. Ct. App. 2014) (where scope of activity restricted was overbroad and unreasonable, rejecting proposed blue-penciling because "Smith would still be prohibited from providing services competitive to those offered by Clark's irrespective of what services Smith actually provided to Clark's during the term of his employment." (quotation omitted)), *trans. denied*, *with Pathfinder Commc'ns Corp. v. Macy*, 795 N.E.2d 1103, 1114-15 (Ind. Ct. App. 2003) (where covenant not to compete provided that radio-show host "will not engage in activities or be employed as an on-air personality, either directly or indirectly," with a direct competitors, deleting "engage in activities or" from the covenant, thus rendering the remaining provisions reasonable). Paragraph 3(b) is therefore unenforceable in its entirety.

[31] The only way we could blue-pencil the covenant not to compete to make it reasonable in scope would be to strike paragraph 3(b) altogether. But this doesn't help the RevOne Companies because they don't argue on appeal that Taylor violated any of the other subsections of the covenant. Since the RevOne Companies' only claim on appeal stemming from the covenant not to compete is that Taylor breached paragraph 3(b), and this paragraph is unenforceable, the trial court did not err in concluding that the RevOne Companies failed to show a reasonable likelihood of success on their claim that Taylor breached the covenant not to compete.

## B. Non-Disclosure Provision

[32] The RevOne Companies also claim the trial court erred in concluding that they did not show a reasonable likelihood of success on their claim that Taylor breached the non-disclosure provision of the 2014 Agreement. Relying on the inevitable-disclosure doctrine, they argue that Taylor "will inevitably disclose RevOne Companies' confidential and proprietary information," thereby violating the non-disclosure provision. Appellants' Br. p. 30. The inevitable-disclosure doctrine is the legal theory that "a key employee, once hired by a competitor, cannot avoid misappropriating the former employer's trade secrets." *Inevitable-disclosure doctrine*, Black's Law Dictionary (12th ed. 2024).

[33] Indiana has recognized the inevitable-disclosure doctrine only "on extreme facts." *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 820 (S.D. Ind. 2007) (citing *Ackerman*, 652 N.E.2d at 510-11). In *Ackerman*, the day after Ackerman was made an offer of employment from one of Kimball's

competitors, he requested and received lists of Kimball's customers and suppliers. The next day, Kimball terminated Ackerman, and the day after that, Ackerman accepted the competitor's offer. Finding that, "in light of Ackerman's pre-departure harvesting of Kimball's proprietary information, there was a threat of misappropriation" of Kimball's trade secrets, the trial court enjoined Ackerman from working for the competitor for one year under the Uniform Trade Secrets Act. *Ackerman*, 652 N.E.2d at 510-11. Our Supreme Court affirmed, holding that a one-year injunction "was arguably necessary to meet the threat of disclosure of Kimball's trade secrets." *Id.* at 511. The District Court in *Dearborn* observed that, while "*Ackerman* indicates that Indiana courts may entertain attempts to use the inevitable disclosure theory, . . . the theory should remain limited to a rare and narrow set of circumstances in which the departing employee has acted in bad faith in taking or threatening to take valuable confidential information from the employer." 486 F. Supp. 2d at 820.

[34] Here, the trial court concluded that the evidence "falls short of demonstrating that Taylor actually retrieved, downloaded, or transferred any confidential or proprietary information of the RevOne Companies." Appellant's App. Vol. II p. 47. We agree. While the digital-forensics report shows the number of locally accessed files and the volume of external storage drive activity on Taylor's company computer, the RevOne Companies have not established that the files accessed contained their confidential or proprietary information or that Taylor took these files with her when she left. While Gietl opined that there was "a strong correlation between the activity of accessing so many files in such a short

time and the high correlation to when the drives were accessed," he acknowledged that he couldn't determine whether "accessed" meant the locally accessed files were opened, read, copied, moved, or deleted. Additionally, though Huff testified that there was "no reason" for Taylor to access some of these files in the period between her resignation and her departure, Taylor explained her responsibilities during that period and that she'd accessed the files in carrying out those responsibilities. The RevOne Companies contend over 3,000 files were uploaded to a Google Drive account from Taylor's computer, but this is a mischaracterization of the evidence. The data shows over 3,000 "Activity References" on Google Drive, Ex. 50, but there is no evidence that these references were uploads. Although the trial court noted in its order that "Gietl also testified that over 3,000 uploads were made from Taylor's computer to a Google Drive account," Appellant's App. Vol. II p. 31, this is incorrect. Gietl referred generally to "Google Drive access" and "drive activity," Tr. Vol. II pp. 196, 198, but he never said what actions were taken on the Google Drive—in fact, he admitted that the digital-forensics report doesn't show whether any particular file was uploaded from the RevOne Companies' network. And while the report shows activity on a Google Drive account, the RevOne Companies made no showing of whose account it was. For Taylor's part, she provided screenshots of her personal Google Drive that don't show any uploads of files from the RevOne Companies, and she testified that she never deleted any RevOne files from her Google Drive. Further, HCM's Chief Information Officer testified that Taylor hasn't disclosed any methods, information, or documents from her tenure at the RevOne Companies.

Despite the RevOne Companies' attempts to liken this case to *Ackerman*, they have failed to demonstrate that Taylor took or threatened to take their confidential information. Their assertion that Taylor will inevitably disclose their confidential and proprietary information is little more than speculation. The trial court did not err in concluding that the RevOne Companies failed to show a reasonable likelihood of success on their claim that Taylor breached the non-disclosure provision. Accordingly, we need not address the remaining requirements for a preliminary injunction.

The RevOne Companies have failed to show that the trial court's judgment is contrary to law.

Affirmed.

Weissmann, J., and Foley, J., concur.

ATTORNEYS FOR APPELLANTS

Sean T. White
Ian T. Keeler
Clapp Ferrucci
Fishers, Indiana

ATTORNEY FOR APPELLEE
JENNIFER TAYLOR

Daniel K. Burke
DKB Legal LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE
HEALTH CARE CLAIMS MANAGEMENT INC.

Ryan M. Hurley
Brian J. Paul
Elizabeth A. Charles
Faegre Drinker Biddle & Reath LLP
Indianapolis, Indiana